**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JEREMY SHULTZ,**

        **Petitioner,**

**v.**                        **Case No. 2:18-cv-00899**


**RALPH TERRY, WARDEN,
Mt. Olive Correctional Complex,**

        **Respondent.**


## PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court are Petitioner Jeremy Shultz's *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 2), and Respondent's Motion for Summary Judgment, (ECF No. 8). This case is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and by Standing Order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

After thorough consideration of the record, the undersigned conclusively **FINDS** that (1) there are no material factual issues in dispute and (2) Petitioner is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned respectfully **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus; and **DISMISS** this case from the docket of the court.

## I.    <u>**Relevant Facts and Procedural History**</u>

In May 2010, a grand jury sitting in Kanawha County, West Virginia returned an indictment charging Petitioner and two codefendants, James Darren Gravely and Sherri Ann Sampson, with Kidnapping in violation of W. Va. Code § 61-2-14a ("Count One"); First Degree Robbery in violation of W. Va. Code § 61-2-12(a) ("Count Two"); and Conspiracy to Commit First Degree Robbery in violation of W. Va. Code 61-10-31 ("Count Three"). (ECF No. 8-1 at 3-4). Petitioner's jury trial on the charges began on February 7, 2011. (ECF No. 8-2 at 2). Petitioner was represented at trial by John R. Mitchell Sr. and John R. Mitchell Jr. *Id.*

The prosecutor outlined the State's case in his opening statement, explaining to the jury how the evidence would show that on the morning of April 27, 2010, Petitioner laid in wait for Danny Nance, a pharmaceutical deliveryman, with a plan to kidnap and rob him of the prescription drugs he carried in his van. (*Id.* at 87-88). Petitioner's counsel elected to defer their opening statement until after the State had rested its case. (*Id.* at 94).

Danny Nance was the first witness to testify. (*Id.* at 95). Mr. Nance stated that in April 2010, he was an employee of Prestige Delivery Service and was responsible for delivering pharmaceutical drugs to numerous pharmacies and health centers located in rural West Virginia. Mr. Nance used his personal vehicle, a minivan, to make these deliveries. (*Id.* at 98-99). On the morning of April 27, 2010, he made his first delivery stop at the Cabin Creek Health Clinic in Dawes, West Virginia at approximately 8:10 a.m. (ECF No. 8-2 at 100, 104). On his way out of the building, Mr. Nance observed a man wearing a dark colored coat with a hood over his head, sitting on a bench outside the entrance. (*Id.* at 100*).* When Mr. Nance began to get in his van, the man approached Mr. Nance from

behind, displayed a gun, and ordered Mr. Nance to get into the van. (ECF No. 8-2 at 100-101). Mr. Nance observed that the gun was a large caliber, semi-automatic firearm with a blue tint. (*Id.* at 101-02). The man holding the gun appeared to be about six feet tall and had short hair. (*Id.* at 103). The hood he wore sat loosely over his head; otherwise, he made no attempt to cover his face. (*Id.*). The man forced Mr. Nance into the passenger seat of the van, climbed in, and began to drive away from the clinic. (*Id.* at 103-04). The man drove Mr. Nance to a secluded area a short distance away where he observed two other individuals arrive in a large white Chevrolet van. (ECF No. 8-2. at 105-06). Mr. Nance did not have the opportunity to see the faces of the other two individuals as one never got out of the van, and the other had his face covered with a shirt. (*Id.*).

 The man who had forced Mr. Nance into the van bound Mr. Nance's wrists and feet with zip ties, and the individuals proceeded to unload Mr. Nance's van of its pharmaceutical content. (*Id.*). Mr. Nance testified that after stealing the drugs, the man who kidnapped him warned Mr. Nance that he had better not identify the man to the police, or the man would "come back after [his] ass." (*Id.* at 109). The man threw Mr. Nance's keys and cell phone into the woods, and all three individuals left in the white Chevrolet van, leaving Mr. Vance still bound and alone in his vehicle. (*Id.* at 109-10). Mr. Nance testified that he eventually freed himself and found his keys after searching for about 15 minutes. He promptly returned to the clinic and reported the incident to the police. (ECF No. 8-2 at 110).

In court, Mr. Nance identified Petitioner as the man who pointed the gun at him. (*Id.*). Mr. Nance testified that he had also identified Petitioner as the perpetrator in a photo line-up presented to him shortly after the incident, and again at Petitioner's preliminary hearing. (*Id.* at 111). When asked how confident he was about his

3

identification, Mr. Nance answered: "I'm sure. I seen, I mean he didn't bother covering his face. I was in that van for 10 minutes looking straight at him wondering what he his [sic] next plan was." (*Id.* at 110).

Mr. Nance further recounted that although he had testified at Petitioner's preliminary hearing that he had not observed any tattoos on the individual who robbed him, as he was driving home following the preliminary hearing, he began to remember seeing a tattoo on the individual's arm. The tattoo was briefly revealed when the individual pushed his coats sleeves up to drive the van. (*Id.* at 121). The prosecutor asked the Court to instruct Petitioner to display his arms to the jury. Petitioner did so, revealing tattoos on both arms with a tattoo on his left arm that extended almost to his wrist (*Id.* at 123-24). Petitioner's counsel did not initially object to the request, but after Petitioner was required to display both arms to the jury, his counsel moved for a mistrial on the grounds that the demonstration improperly exposed Petitioner's regional jail identification bracelet to the jury and Mr. Nance's last-minute recollection of seeing tattoos constituted unfair surprise evidence. (ECF No. 8-2 at 123-24). The Court denied defense counsel's motion. (*Id.* at 141).

West Virginia State Trooper Scott Pettry was next called as a witness by the prosecution. (*Id.* at 203). Trooper Pettry testified that he responded to a robbery at Cabin Creek Health Clinic on April 27, 2010, arriving at around 9:00 a.m. (*Id.* at 204). Trooper Pettry stated that shortly after he responded, he was informed by Detective Don Scurlock of the Kanawha Bureau of Investigations that there was an ongoing investigation involving an individual named Curtis Wilson, a former Prestige Delivery driver, that might be relevant to the reported robbery. (*Id.* at 206). Detective Scurlock reported that Mr. Wilson had recently been fired for suspected theft of medications and owned a white

Chevrolet cargo van. (*Id.* at 206-07). Trooper Pettry testified that Petitioner was subsequently identified to him as a person of interest, following a conversation Detective Scurlock had with Mr. Wilson regarding the April 27th robbery. (ECF No. 8-2 at 215). Trooper Pettry testified that on April 28, 2010 he showed Mr. Nance a photo-lineup that included a picture of Petitioner, and Mr. Nance identified Petitioner as the individual who robbed him. (*Id.* at 215-16). Trooper Pettry also testified about conversations he had with Curtis Wilson and a third suspect, James Darren Gravely, both of whom implicated Petitioner in the kidnapping and robbery. (*Id.* at 217, 219-20).

Lisa Belmont York, an employee at Cabin Creek Health Clinic, took the stand on the second day of trial. (ECF No. 8-3 at 28). Ms. York testified that she arrived to work on the morning of April 27, 2010 and saw a man sitting on a bench near the entrance to the clinic. She described the man as having a medium build and dark hair, wearing dark clothes and a hooded coat. (*Id.* at 28-29). On cross examination, defense counsel asked Ms. York if she could identify the man she saw that morning as being anyone in the courtroom. Ms. York responded that she could with "50 percent accuracy, maybe." (*Id.* at 30-31). On redirect examination the prosecutor asked Ms. York if Petitioner resembled the man she saw on the bench in April 2010. Over defense counsel's objection, Ms. York responded "[h]e could possibly be, yes." (*Id.* at 31-32).

Following Ms. York's testimony, Curtis Wilson was presented as a witness. (*Id.* at 36). Mr. Wilson testified that he had recently pled guilty to an unrelated breaking and entering charge and also to conspiracy to commit the robbery at issue in the trial. (ECF No. 8-3 at 37). Mr. Wilson testified that he had loaned Petitioner his white Chevy cargo van the day before the robbery. (*Id.* at 37-38). Mr. Wilson stated that his van had a Global Positioning System ("GPS") device, which contained information showing the Prestige

Delivery route and the times of the stops, marking Cabin Creek Health Clinic as the first stop on the route. Mr. Wilson asserted that he had informed Petitioner of this fact. (*Id.* at 39).

When asked by the prosecutor if he knew that Petitioner planned to use the van to "do something with it," Mr. Wilson replied that he "assumed" Petitioner would. When asked why he made this assumption, Mr. Wilson said "I really don't know I just assumed they would." (ECF No. 8-3 at 40-41). Mr. Wilson said that he "really didn't think anything about it" of lending Petitioner his van, as he often let people use his van. (*Id.* at 42). Mr. Wilson testified that James Gravely had previously asked him about borrowing the van to perform a robbery. (*Id.* at 41). On further questioning, Mr. Wilson revealed that he had incurred a debt with Petitioner, and that he "just assumed" the debt would be canceled after lending Petitioner the van. (*Id.* at 42-43). Mr. Wilson went on to variously testify that he lent Petitioner the van because he was "just trying to be his friend," that he knew something was going to go down with the van, and that he thought Petitioner and Mr. Gravely were going to sell it. (*Id.* at 43).

On cross examination, defense counsel's questions revealed that Mr. Wilson had admitted to law enforcement officers he had been stealing drugs while employed as a delivery driver for Prestige Delivery, but had never been charged for those crimes. (ECF No. 8-3 at 44-47). Defense counsel also elicited concessions from Mr. Wilson that he had made numerous contradictory statements about the conspiracy to law enforcement and was receiving a favorable deal for his testimony at trial. (*Id.* at 51-52). Mr. Wilson also admitted that he was assured by law enforcement investigators that he would receive more favorable treatment if he implicated Petitioner in the crime. (*Id.* at 53). Finally, defense counsel questioned Mr. Wilson about the debt he owed to Petitioner, and Mr.

Wilson acknowledged that, with Petitioner on trial for the robbery, Mr. Wilson was able to avoid the debt he owed. (*Id.* at 57).

On redirect examination, the prosecutor established that Mr. Wilson had already received his sentence in the instant case, and that consequently, if he did not implicate Petitioner at the trial there could be no effect on his sentence. (ECF No. 8-3 at 62). On re-cross, defense counsel confronted Mr. Wilson with testimony from his plea hearing and Mr. Wilson testified that he did not remember making those statements, that he may have been on drugs at the time of his testimony, and that he was also under the influence of drugs when he spoke to police officers following the robbery. (*Id.* at 63-65).

James Darren Gravely was the next witness to testify for the State. (*Id.* at 69). Mr. Gravely testified that he had pled guilty to first degree robbery in connection with the case at trial. (*Id.* at 70). Mr. Gravely asserted that he had participated in the robbery of a delivery van at the Cabin Creek Health Clinic with two other individuals. Mr. Gravely identified his ex-wife, Sherri Sampson, as one of the involved individuals, but stated he could not recall the identity of the other individual. (*Id.*). Mr. Gravely stated he could not recall what the other individual looked like, adding that he did not know the man before the man picked Mr. Gravely up from the side of the road and asked him to participate in the robbery. (*Id.* at 84). When confronted with prior statements, given at Mr. Gravely's plea hearing and in an interview with law enforcement officials, that the third individual was Petitioner, Mr. Gravely stated that he had been coerced into implicating Petitioner by law enforcement officers. (ECF No. 8-3 72-73, 75). Mr. Gravely testified he had been told if he implicated Petitioner he could go home, but now his conscience demanded that he tell the truth. (*Id.* at 75-76). When Mr. Gravely continued to insist that Petitioner was not present at the crime, the prosecution played an excerpt of Mr. Gravely's interview with

Trooper Pettry in which Mr. Gravely implicated Petitioner in the crime. (*Id.* at 87-88).
The State additionally confronted Mr. Gravely with a statement made to his probation
officer that Petitioner and Mr. Gravely's ex-wife were the ones who came up with the idea
of committing the robbery. (*Id.* at 97-98).

On cross examination, defense counsel prompted Mr. Gravely to reveal that, unlike
the other co-conspirators, he had not yet been sentenced by the State. (*Id.* at 104). Defense
counsel further elicited from Mr. Gravely his belief that the State likely waited to sentence
him in order to maintain leverage over his testimony at trial and, by absolving Petitioner
of blame in the robbery, Mr. Gravely stood to lose access to any plea deal he might have
reached with the State. (*Id.*). Notwithstanding the possibility that his testimony would
jeopardize his chances of receiving a favorable plea deal, Mr. Gravely testified that he felt
compelled to tell the truth. (ECF No. 8-3 at 105-06).

Following Mr. Gravely's testimony, the State called Trooper Pettry back to the
stand. (*Id.* at 134). Trooper Pettry stated that, contrary to the testimony of Mr. Gravely,
he did not promise Mr. Gravely a "safety net" if he implicated Petitioner in the crime, and
he did not in any way attempt to pressure Mr. Gravely or Curtis Wilson to name Petitioner
as an accomplice in the crime. (*Id.* at 135, 139).

The State called a final witness, Deputy Jason Powell, to testify about a
conversation he overheard between Petitioner and Sherri Sampson, a co-conspirator and
future witness in the case. The conversation occurred during a break in the trial
proceedings after the testimony of Mr. Gravely, and was overheard by Deputy Powell
during his assignment as a bailiff at the trial. (*Id.* at 141). Deputy Powell testified that
Petitioner said to Ms. Sampson, "Did you hear what he did for me?" and Ms. Sampson
replied, "Well maybe that means you're going home." (*Id.* at 145). Defense counsel

established that Petitioner was aware Deputy Powell was able to hear the conversation. (*Id.* at 147).

After the testimony of Deputy Powell, the State rested its case. Defense counsel moved for acquittal due to the State's failure to prove a *prima facie* case, which the Court denied. (ECF No. 8-3 at 150, 153). Prior to presenting their defense, defense counsel informed the Court that Paul Martin, a witness who had been expected to testify, had been present in the morning, but was forced to leave due to illness. (*Id.* at 156). Defense counsel noted they had been unable to contact Mr. Martin since he left for the hospital, but he was a "an important witness for us," and they hoped to monitor the situation and have Mr. Martin testify at a later point in the proceedings. (*Id.* at 156-157).

Defense counsel began Petitioner's case with the opening statement, informing the jury that not only did Petitioner not commit the charges of which he was accused, but he was not present anywhere near the scene at the time the crimes occurred. According to counsel, the evidence would show that Petitioner had spent the weekend in Columbus, Ohio with a friend of his, Paul Martin, and did not return to West Virginia until the early morning hours of April 27, 2010. Accordingly, when Mr. Vance was kidnapped at 8:10 a.m., Petitioner was home in bed and would not wake up until hours later. (*Id.* at 158).

The first witness defense counsel called to the stand was Alicia Slater, Petitioner's girlfriend. (*Id.* at 159, 161). Ms. Slater testified that the first time she saw Petitioner on April 27, 2010 was around 2:30 a.m. when he returned from Columbus, Ohio to the home that they shared in Dunbar, West Virginia. (ECF No. 8-3 at 162). Ms. Slater stated that Petitioner had spent the weekend in Columbus, while she stayed at home. Upon his return home, both Petitioner and Ms. Slater promptly went to bed. Ms. Slater confirmed that she remained with Petitioner all morning except for the half hour between 8:15 and 8:45 a.m.

9

when she took her son to school. (*Id.* at 163-64). Ms. Slater asserted that Petitioner remained at their house until around 11:30 a.m. when he left to attend a birthday party for his niece. (*Id.* at 164-65).

Counsel next called Macaila Lamb, Ms. Slater's cousin, as a witness. (*Id.* at 175, 177). Ms. Lamb testified that she went to Ms. Slater's home around 9:00 a.m. on April 27, 2010 to borrow a pair of jeans. Ms. Slater was busy feeding her child breakfast, so Ms. Lamb went into the bedroom to retrieve the jeans and saw Petitioner asleep in bed. (*Id.* at 181). On cross examination, Ms. Lamb agreed that it may have been 9:15 a.m. when she arrived at Ms. Slater's home; however, she was certain it was no earlier than 9:00 a.m. (ECF No. 8-3 at 183-84). Ms. Lamb also admitted that she could not account for Petitioner's whereabouts before 9:00 a.m.

Following Ms. Lamb's testimony, Sherri Sampson took the stand. Ms. Sampson indicated that she was currently serving a sentence of 1-5 years imprisonment after pleading guilty to conspiracy to commit robbery in the case at trial. (*Id.* at 187-88). Ms. Sampson testified that on April 26, 2010, she, Curtis Wilson, and James Gravely, her ex-husband, all met at Mr. Wilson's house. (*Id.* at 193). Ms. Sampson testified that she and Mr. Gravely spent the night driving around in Mr. Wilson's van while taking methamphetamine. She stated that if Mr. Wilson told anyone that Petitioner had borrowed the van, he was lying. (*Id.* at 194-95). Ms. Sampson opined that Mr. Wilson had a motive to tell this lie in order to "get his self off of the big charge." (*Id.* at 195). Ms. Sampson stated that she and Mr. Gravely borrowed Mr. Wilson's vehicle so that they could rob Mr. Vance's delivery van, and Mr. Wilson was aware of their purpose in borrowing his vehicle. (*Id.*).

Ms. Sampson testified that the third party involved in the robbery was not

10

Petitioner, but was a man named Mikey, whom she believed to be an individual named Mikey Ward. (ECF No. 8-3 at 195-96). Ms. Sampson asserted that Mr. Gravely was the one to hold a gun on Mr. Nance and steal the delivery van, while she and Mr. Ward followed in Mr. Wilson's van. (*Id.* at 198-99). Ms. Sampson stated that she had consistently told the same story about the robbery, that Mr. Ward was the third party, not Petitioner, and that, despite this fact, law enforcement officers had never investigated Mr. Ward. (*Id.* at 203-04). On cross-examination, Ms. Sampson admitted that Mr. Gravely had been bald at the time of the robbery. (*Id.* at 211). She insisted that if two other witnesses testified that the man sitting on the bench at the clinic on the morning of April 27, 2010 had dark hair, they would be "full of it" because Mr. Gravely was the man sitting on the bench. (*Id.* at 211-12).

On the third day of trial, defense counsel first called Trooper Pettry as a witness and questioned him about inconsistencies in Mr. Wilson's statements to police, as well as irregularities in the photo array provided to Mr. Nance. (ECF No. 8-4 at 41-42). Anthony Shultz, Petitioner's brother, also testified. He corroborated Petitioner's account of being in Ohio until the morning of April 27, 2010 and attending a birthday party at around noon that same day. (*Id.* at 49).

Petitioner then testified in his own defense. (*Id.* at 55). Petitioner stated that he and a friend traveled to Columbus, Ohio to visit a third friend the weekend prior to April 27. They spent the weekend shopping and eating at restaurants, leaving Columbus on the night of Monday, April 26 and arriving home in the early morning hours of April 27, 2010. (*Id.* at 57). Petitioner stated that he went to bed and slept until around 10:30 or 11:00 a.m.

Defense counsel questioned Petitioner about when he first became aware that he was charged in the kidnapping and robbery. Petitioner testified that early in May 2010,

he went to see his parole officer to get his discharge papers. (*Id.* at 58*).* Petitioner explained that he had been on parole following a conviction for attempted breaking and entering and was completing that sentence. (ECF No. 8-4 at 57-58). When Petitioner arrived at the parole office, three state troopers were waiting to arrest him. When they told him why they were there, Petitioner was shocked. (*Id.* at 62). He knew nothing about the crime and denied playing any role in it. Petitioner testified that he had never been a drug user or dealer and had been tested for drugs regularly while on parole. He stated that he was nearing the end of his sentence on April 27 and would not have done anything to violate the terms of parole so close to being free of supervision. Petitioner emphasized that he would never have carried a weapon as that act alone would have resulted in an automatic five-year jail sentence. Petitioner stated that he did not need money, because he had received a life insurance settlement in the amount of $78,000 four months earlier and still had a substantial sum of money remaining. (*Id.* at 60-61). He had a house, a girlfriend, and planned to go to school; therefore, he had no reason to commit the crime of which he was accused. Petitioner testified that he had consistently denied participating in the crime and stated "I've been trying to tell people I haven't committed it. I even said I'd take a lie detector test in the beginning. Nobody would let me take it." (*Id.* at 63).

On cross examination, the prosecutor asked Petitioner about conversations he had with law enforcement officers regarding his role in the robbery. (*Id.* at 72). Petitioner testified that he asked the officers to give him a lie detector test to prove his innocence, but the officers delayed administering the test so they could continue to interview him. (*Id.*). The prosecutor asked Petitioner why he had not told the interviewing officer about the alibi defense he presented in court, and Petitioner responded: "I was not asked for an alibi. He kept pressuring me into saying '[g]ive me a story.'" (ECF No. 8-4 at 74-75).

Petitioner testified that he "just wanted a lie detector test," but stated he did tell the interviewing officer that he was at home in bed at the time of the crime and Ms. Slater would corroborate his story. (*Id.* at 76-77). The prosecutor questioned Petitioner about his contention that he did not commit the robbery, because he did not need the money. The prosecutor asked Petitioner to admit that he had called his mother several times the night before and complained that he had no money left. Moreover, he had made these calls using another person's pin number so that the calls could not be traced to him. Petitioner initially denied making phone calls to his mother the previous night using someone else's pin number, but later conceded he had made the phone calls. (*Id.* at 79-80).

> On redirect examination defense counsel initiated the following exchange:
>
> Q:  I'm going to break a rule. I'm going to ask you a question I don't know the answer.  Did you get permission from your parole officer to go to Ohio?
>
> A:  No, I didn't, but I wasn't getting in trouble, so I didn't think I would get in trouble.

(*Id.* at 92). The prosecutor pointed out on cross examination that leaving West Virginia was a violation of parole that could have put Petitioner "back inside"; however, Petitioner testified that he did not think such a violation would have gotten him in trouble.

Defense counsel then called Dr. David Clayman to testify as an expert witness. (*Id.* at 98). Dr. Clayman stated that he had a Ph.D. in clinical psychology and was trained in "Biopsychosocial approaches to behavior." (*Id.* at 99). Dr. Clayman testified that the scientific literature revealed reliability concerns related to eyewitness identifications based on pictorial lineups. (ECF No. 8-4 at 117-118). Dr. Clayman described specific circumstances that raised the chance of a misidentification occurring, and noted that telling the witness the suspect may not be in the pictures decreased the risk of

13

misidentification. (*Id.* at 119-120). When asked what factors would make an identification less reliable, Dr. Clayman stated, "[h]igh intensity threatening situations that last a short period of time generally lead to more inaccurate identifications." (*Id.* at 123). Dr Clayman also noted that an initially inaccurate memory can become reinforced over time and the person holding the memory may become more confident in its accuracy. (*Id.* at 121).

Defense counsel asked Dr. Clayman to consider a hypothetical eyewitness identification that was based on facts similar to those at issue in the trial and to describe any factors that might increase the likelihood of misidentification. (ECF No. 8-4 at 127-29). Dr. Clayman responded that while the "emotionality would probably impact coding of information at the time," a positive eyewitness identification based on that factual scenario would be "problematic for the defense in that kind of case." (*Id.* at 130). Dr. Clayman did note that the presence of a weapon in the hypothetical could potentially lead to issues with identification. (*Id.* at 131). Dr. Clayman stated that the fact that police officers had told Mr. Nance it was possible the culprit may not be in the picture line-up decreased the likelihood of misidentification. (*Id.* at 138). Dr. Clayman opined it was "possible," the victim's identification in the given hypothetical was wrong, but it would be dependent on many individual factors. (*Id.* at 134).

After the defense rested, the State called Mr. Nance as a rebuttal witness. (*Id.* at 143). Mr. Nance was shown a picture of Mikey Ward, and Mr. Ward was additionally presented to Mr. Nance in the courtroom. Mr. Nance stated that Mr. Ward was not the person who robbed him, and he was certain of this conclusion. (*Id.* at 155-56). At the close of evidence, defense counsel made a motion for a judgment of acquittal, which the Court again denied. (ECF No. 8-4 at 162, 166).

On the final day of trial, the prosecution highlighted in their closing statement the

amount of time Mr. Nance had to observe the face of the man who kidnapped him, and the certainty with which Mr. Nance identified Petitioner. (*Id.* at 218-19). The prosecutor also urged the jury to recall Dr. Clayman's testimony in answer to the hypothetical question posed by defense counsel that was based on facts similar to the case at hand. Dr. Clayman testified that because the eyewitness identification by Mr. Nance was made the next day, there was less chance of it being contaminated and more chance of it being accurate. (*Id.* at 217). The prosecution also called into question Petitioner's alibi defense, noting that the only person who could account for Petitioner's whereabouts during the relevant time period was Ms. Slater, who was not an impartial witness. (*Id.* at 224). The prosecution attempted to discredit Petitioner's defense that he lacked a motive to commit the robbery due to his imminent release from parole by noting that Petitioner did not hesitate to violate his parole by traveling to Ohio without permission. (*Id.* at 273). As to Petitioner's assertion that he was financially secure and had no need to commit a robbery, the State asked the jury rhetorically, "Who knows? Maybe he likes the thrill of it. Why did he pull his first attempted B&E?" The prosecutor also noted that Petitioner had spent well over half of the $78,000 he received in approximately four months. (*Id.* at 274).

In the jury instructions, Judge Bailey informed the jury that they were the "sole judges of the credibility of the witness and the weight of the evidence." (*Id.* at 186). She instructed the jury that they could consider contradictory statements made by witnesses as evidence of their credibility but, "contradictory statements, if any, may not be considered by the jury to establish the truth of such statements." (*Id.* at 188).

As the jury was deliberating, they sent a note to the Court asking if they could listen to the audio recording of Mr. Wilson's police interview, and Mr. Gravely's recorded interactions with police officers. (ECF No. 8-4 at 282-83). The parties noted in discussion

that these recordings had never been admitted into evidence. (*Id.* at 283). However, the parties agreed they did not want to give the jury the impression that the recorded statements made by Mr. Gravely and introduced at trial were not part of the evidence. Petitioner's counsel opined that the recording could be considered "like anybody else testifying, I guess." (*Id.* at 284). As such, the parties agreed that the jury could not listen to the recordings and agreed on an instruction which informed the jury that the recordings were not admitted into evidence, but instructed the jury to consider the excerpt of the recorded statement by Mr. Gravely that was played at trial as "all other evidence in the case is considered." (*Id.* at 285-86).

Later that day, the jury returned and announced that it had found Petitioner guilty on all counts. (*Id.* at 287-88). The jury returned a verdict recommending mercy on Count I, and made the additional finding that Petitioner used a firearm in the commission of Counts One and Two. (ECF No. 8-5 at 2-3). In a sentencing order dated February 11, 2011, Judge Bailey sentenced Petitioner to life, with mercy, on Count One of the indictment. (ECF No. 8-6 at 2). Petitioner was sentenced to an additional 10 years imprisonment on Count Two, and to an indeterminate term of not less than 1 year, nor more than 5 years, on Count Three, with both sentences to run consecutively. (*Id.* at 3).

Petitioner filed an appeal on May 23, 2012. (ECF No. 8-11 at 2). In the appeal, Petitioner raised four grounds for relief.

> 1.The trial court abused its discretion when it did not weigh probative value and prejudicial effect as required by Rules 401, 402 and 403 of the West Virginia Rules of Evidence. (*Id.* at 6).
>
> 2. The trial court erred in failing to dismiss the charge of kidnapping as the crime was incidental to the robbery. (*Id.* at 8).
>
> 3. The court erred when it imposed a disproportionate penalty for kidnapping. (*Id.* at 9).

4. Violation of due process. (*Id.* at 12).

The Supreme Court of Appeals of West Virginia ("WVSC") denied Petitioner's appeal on April 16, 2013. (ECF No. 8-14 at 5). The WVSC found that the circuit court did not fail to weigh the probative value of requiring Petitioner to display his tattoos against its prejudicial effect as required by law, as Petitioner's counsel did not file a timely objection to the display, and as Petitioner failed to demonstrate any prejudicial effect experienced due to the display. (*Id.* at 3). The WVSC held that the trial court did not err in failing to dismiss the kidnapping charge as the kidnapping was not merely incidental to the robbery because the victim was "transported for approximately five minutes from an area of relative safety to a more secluded location where he was exposed to an increased risk of harm." (*Id.* at 4). The WVSC additionally found that Petitioner was not entitled to the benefit of the mitigating factors contained in West Virginia Code § 61-2-14a as the trial court appropriately found that Petitioner had not "returned or permitted to be returned" the victim as required by the statute. (ECF No. 8-14 at 4). Finally, the WVSC rejected Petitioner's argument that the application of West Virginia Code § 61-2-14a to his case violated his due process rights as the WVSC had already addressed the question and found that the statute complied with the requirements of the Sixth Amendment. (*Id.* at 5).

On June 29, 2013, Petitioner filed a *pro se* Petition for Habeas Corpus under West Virginia Code § 53-4A-1. (ECF No. 8-16). Petitioner asked that an attorney be appointed to represent him. (*Id.* at 21). In the petition, Petitioner argued that his trial attorneys provided ineffective assistance of counsel via a variety of procedural and strategic errors. (*Id.* at 7-8). Petitioner first contended that his attorneys' failure to raise a proper objection

to the State's demand that he display his tattoos was ineffective assistance as he informed counsel that such a display would be prejudicial. Petitioner stated that he gave this warning to one of his attorneys, Mr. Mitchell Jr., because his tattoo displayed an individual with a sack of money in one hand, apparently running from a police car depicted in the background. However, Mr. Mitchell Jr. misconstrued Petitioner's objection and instead argued before the Court that it was the display of Petitioner's jail identification band that was prejudicial, resulting in Petitioner being forced to show his tattoos to the jury. (*Id.* at 24). Petitioner believed that counsel's failure to properly object to the display and request a hearing to weigh the probative value of the display against its prejudicial effect constituted ineffective assistance. (*Id.* at 25).

Petitioner criticized his attorneys' handling of evidence regarding deficiencies in eyewitness identifications, arguing that their decision to call Dr. Clayman as an expert witness proved "disastrous for the defense." (*Id.* at 30). Petitioner additionally argued that his attorneys were constitutionally defective when they failed to secure the testimony of Paul Martin who was slated to testify in support of Petitioner's alibi. (ECF No. 8-16 at 43). Finally, Petitioner faulted his counsel for their failure to utilize *voir dire* procedures, failure to disclose conflicting interests, and failure to object to the "overwhelming" police presence during his trial. (*Id.* at 26, 39, 44).

Petitioner's request that an attorney be appointed to represent him in his habeas petition was apparently granted, as on August 15, 2014, Petitioner filed an Amended Petition for a Writ of Habeas Corpus through his attorney, Sam Marsh. (ECF No. 8-17). In the Amendment, Petitioner stated the following claims:

> 1) Defense counsel introduced evidence of Petitioner's prior felony conviction, his parole status, and other bad character evidence at trial;

2) Defense counsel failed to object to impeachment evidence being considered by the jury as evidence of Petitioner's guilt;

3) Defense counsel failed to object to the admissibility of Petitioner's "robbery tattoo" at trial;

4) Defense counsel failed to adequately investigate before presenting an expert witness whose testimony incriminated Petitioner;

5) Defense counsel failed to present an essential alibi witness at trial;

6) Defense Counsel failed to object, or to ask for a mistrial, when the State repeatedly commented on Petitioner's post-*Miranda* arrest silence;

7) and, Defense Counsel failed to conduct any substantive general *voir dire*, and no individual *voir dire* during jury selection.

(ECF No. 8-17 at 2-3). Petitioner argued that these errors, considered either individually or cumulatively, raised "significant constitutional issues that deserve to be addressed." (*Id.* at 3). On December 3, 2015, Petitioner, now represented by attorney Edward Bullman, filed a Second Amendment to his Petition for Writ of Habeas Corpus. (ECF No. 8-18). Petitioner added a single claim, arguing that, "the court below violated his right to a jury trial under the 6th Amendment to the United States Constitution when it imposed a determinate life sentence on the Petitioner under W. Va Code § 61-2-14a(a)." (*Id.* at 2). In the alternative, Petitioner asked that the court reconsider the presence of the specified mitigating factors in his case. (*Id.*). On June 5, 2015, the State filed a Response to Petitioner's request for habeas relief in which it argued that Petitioner's request be denied as he failed to establish that his trial counsel was objectively deficient and that the result of Petitioner's trial would have been different but for any alleged deficiency. (ECF No. 8-20 at 41).

On December 14, 2015, Judge Bailey held an omnibus evidentiary hearing to consider Petitioner's habeas proceeding. (ECF No. 8-21). Mr. Bullman, representing

Petitioner at the hearing, called Mr. Martin to the stand. (*Id.* at 5). Mr. Martin testified that he was present at the courthouse during Petitioner's trial and prepared to testify, but became ill with walking pneumonia and bronchitis and was forced to go to the hospital. (*Id.* at 6-7). Mr. Martin stated that he was released from prison, after serving a five-year sentence, on April 10, 2010, and remembered attending a birthday party with Petitioner near the end of April. (*Id.* at 7-8). Mr. Martin stated that prior to attending the birthday party, he and Petitioner had traveled to Columbus, Ohio for the weekend to celebrate Mr. Martin's release from prison. (*Id.* at 8). Mr. Martin estimated that he and Petitioner arrived back in West Virginia at around 1 or 2 in the morning on Tuesday and confirmed that Petitioner was with him the entire weekend (*Id.* at 8-9).

On cross examination, Mr. Martin stated that Petitioner was "more of a brother" than a friend. (ECF No. 8-21 at 10). Mr. Martin also testified that when he and Petitioner arrived in West Virginia they went together to Petitioner's house, and Mr. Martin then took a taxi home. Mr. Martin stated that he returned to Petitioner's house in the taxi about an hour later and remained with Petitioner until they went to the birthday party together. (*Id.*).

Petitioner then took the stand to testify. (*Id.* at 11). Petitioner testified that his attorneys had never discussed calling Dr. Clayman as an expert witness with him, and they decided to do so without consulting him. (*Id.* at 13). Petitioner also asserted that his attorneys did not discuss with him the strategy to reveal that he was on parole for a criminal conviction prior to asking about his status at trial. (*Id.* at 13-14). Petitioner denied telling his defense counsel to proceed with trial without Mr. Martin; instead, insisting that he asked them to produce Mr. Martin for trial. (*Id.* at 16). Finally, Petitioner revealed that he was not under arrest when questioned by Trooper Pettry and further

asserted that he never made any statements at all to police officers. (ECF No. 8-21 at 17).

On cross examination, the State questioned Petitioner about the discrepancy between his account at trial, where he stated that he had dropped Mr. Martin off at Mr. Martin's house before returning home on the morning of the 27th, and Mr. Martin's assertion that he had instead taken a taxi home from Petitioner's residence, and then taken another taxi ride back to Petitioner's residence on the morning in question. (*Id.* at 18). Petitioner agreed that there were differences in their testimony. Petitioner also conceded that he had told Trooper Pettry that he did not commit the robbery and requested a lie detector test, and allowed that he may have made those statements more than once. (*Id.* at 19).

Finally, Petitioner's trial attorney, John Mitchell Jr., took the stand. (*Id.* at 22). Mr. Mitchell testified that at the time of Petitioner's trial, he had been licensed as an attorney for approximately 30 years and had engaged in "thousands" of trials, with less than 100 of those being jury trials. (*Id.* at 23-24). Mr. Mitchell stated that their trial strategy was to present a defense that was "projected and consistent with [Petitioner] and his steadfast position that he didn't do it and we had nothing to hide." (*Id.* at 25). Mr. Mitchell stated that his practice was to never tell a client what to do, but to advise and inform clients so that they could make informed decisions. (ECF No. 8-21 at 26). Mr. Mitchell stated that he would not have decided to forego asking for a continuance due to Mr. Martin's absence without first discussing the issue with Petitioner and that "based upon the circumstances as they were at the time," they decided to "go forward with what we had." (*Id.* at 27).

Mr. Mitchell asserted that he did discuss the tactic of revealing Petitioner's parole status with Petitioner, and Petitioner agreed to do so in order to present a consistent strategy that Petitioner was innocent and "had nothing to hide," as well as showing that

21

he had no motive to commit the robbery as he was passing drug tests and about to be released from parole. (*Id.* at 29-30). Mr. Mitchell denied calling Dr. Clayman as a witness without clearing that option with Petitioner, stating that Petitioner would have had to agree to pay for the services of Dr. Clayman before he could be presented as a witness. (*Id.* at 33).

Mr. Mitchell clarified that calling Dr. Clayman "was an act of backing up 15 yards and punting," as the last-minute decision to call Dr. Clayman was precipitated by two unforeseen events occurring at trial. (*Id.* at 30). The first was Mr. Nance reversing his earlier statement that he did not recall seeing any tattoos then stating at trial he actually did recall seeing tattoos on the arm of the man who robbed him. (*Id.* at 31). The second was the testimony of Ms. York, who had earlier stated she was unable to identify the man she saw outside of the Cabin Creek Health Clinic on the day of the robbery, but at trial indicated that she believed Petitioner was the same man. (ECF No. 8-21 at 32). Mr. Mitchell stated that he and his father were "caught by surprise" by these revelations and decided to call Dr. Clayman in an effort to explain to the jury how these "improvements" in memory might be suspect. (*Id.* at 31-32). Mr. Mitchell noted that "ideally we would've had a month with Dr. Clayman" in order to "do a little woodshedding if that was practical," but that they "took that chance" in an effort to rebut the unexpected testimony of two important witnesses. (*Id.*). Mr. Mitchell stated that he asked some questions that had the potential to lead to damaging answers as "sometimes it's better to ask it yourself than have the prosecutor ask the question." (*Id.* at 33).

On cross examination, Mr. Bullman inquired of Mr. Mitchell if he discussed the case with Dr. Clayman prior to trial. Mr. Mitchell responded that he and Dr. Clayman had discussed the case the night before Dr. Clayman's testimony. (*Id.* at 36). Mr. Mitchell

further stated that he had given Dr. Clayman the hypothetical posed to him at trial "in general" during their discussion. (*Id.* at 35). Mr. Mitchell asserted that they "didn't just pull [Dr. Clayman] off the streets," and that he had filled Dr. Clayman in on the hypothetical question posed at trial before his testimony. (ECF No. 8-21 at 37). When asked if he was surprised by Dr. Clayman's statement that the hypothetical was a "problem" for the defense, Mr. Mitchell responded that he was "disappointed" by it. Mr. Mitchell then clarified that he had not asked that exact question prior to trial but had "categorized" the case to Dr. Clayman. (*Id.*).

Mr. Bullman asked Mr. Mitchell why he had not requested a limiting instruction directing the jury to only consider as impeachment evidence a recording that the State played of an interview between Trooper Pettry and Mr. Gravely. (*Id.* at 40). Mr. Mitchell responded:

> A: Boy, I don't know. I don't know that it was something that was highlighted in what we were trying to deal with at the time. I guess in hindsight, that might have been something. In hindsight, I guess maybe we should have taken a posture objecting to everything, Mr. Bullman. But again, we came from the very beginning from *voir dire* right on to the very end of --we didn't do it, we have nothing to hide and we have nothing to cover up and this is what it is. We're going to show it to you dirty sheets and all.

 (*Id.*). Mr. Mitchell further explained that the decision not to instruct the jury on impeachment evidence was a "strategic" decision as they "didn't feel that it was necessary or consistent to introduce an instruction to highlight that scenario" in part because Mr. Mitchell was averse to "turn around and start browbeating somebody that's providing exculpatory evidence for my client, it certainly didn't go with the flow." (ECF No. 25 at 43). Mr. Mitchell believed that the "last thing we wanted to do was to create any negative connotations toward either one of those witnesses." (*Id.* at 44-45).

On February 4, 2016, Petitioner filed a Memorandum of Law in Support of Post Conviction Habeas Corpus Motion to Reconsider or Reduce Sentence in which Petitioner argued that the evidence established during the omnibus evidentiary hearing supported his claim that he was entitled to habeas relief. (ECF No. 8-19 at 2). Petitioner contended that his attorneys committed the following errors:

> use of prior inconsistent statements as evidence of guilt, presenting evidence of your criminal history, failure to offer alibi witness, presenting an expert without interviewing the expert and having that expert bolster the State's case, failure to limit the prejudicial effect of the tattoo, and impeachment of post arrest silence.

(*Id.* at 13). Petitioner argued that these errors "taken together amount to sufficient ineffective assistance of counsel to warrant a new trial." (*Id.*). Petitioner also restated his argument that West Virginia's kidnapping statute violates the Sixth Amendment based on the decisions of the Supreme Court of the United States ("Supreme Court") in *United States v. Booker*, 543 U.S. 220, (2005) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (*Id.* at 14-15).

On September 2, 2016, Judge Bailey adopted the proposed findings of fact, conclusions of law and disposition proffered by the Respondent and issued a Final Order disposing of Petitioner's habeas petition. (ECF No. 8-22 at 2). Judge Bailey described Petitioner's motion for relief as asserting the following claims of error:

> (a) Ineffective assistance of counsel by introducing the petitioner's parole status, previous felony conviction, and other "bad character" evidence; (b) Ineffective assistance of counsel in failing to object to use the of [sic] impeachment evidence as evidence of guilt and failing to request an instruction as to the limited use of impeachment evidence and failing to request a "*Caudill*" instruction as to the proper weight to be given to a guilty plea by a co-defendant; (c) Ineffective assistance of counsel by failing to object to the exhibition of petitioner's tattoos; (d) Ineffective assistance of counsel by offering the testimony of Dr. Clayman; (e) Ineffective assistance of counsel by failing to offer the alibi witness, Paul Martin; (f) Ineffective assistance of counsel for failing to object to the state's comment upon the

petitioner's post arrest and post-Miranda silence; (g) cumulative error; and (h) the sentencing scheme for kidnapping is unconstitutional.

(*Id.* at 16). Judge Bailey first dismissed Petitioner's claim that West Virginia's kidnapping statute violates the Sixth Amendment, citing *State v. Haught*, 218 W. Va. 462, 624 (2005), and noting, "[t]he West Virginia Supreme Court of Appeals has heretofore considered, and rejected the contention that the sentencing scheme violates *Apprendi*, or deprives an individual of his right to a trial by jury." (*Id.* at 23).

In discussing Petitioner's ineffective assistance claims, Judge Bailey addressed the standard for assessing claims of ineffective assistance, stating that West Virginia addresses such claims under the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). (*Id.* at 24). Judge Bailey explained that the *Strickland* standard requires a defendant to show that "1) his trial counsel's 'performance was deficient under an objective standard of reasonableness; and 2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.'" (*Id.*) (citing *State v. Miller*, 194 W. Va. 3, 15 (1995)).

Judge Bailey determined that Petitioner's first sub-claim, that his counsel's introduction of Petitioner's prior felony conviction and parole status constituted ineffective assistance, failed as the "strategy was a reasonable one in view of the facts and circumstances." (*Id.* at 28). Judge Bailey found Mr. Mitchell's assertion that Petitioner had been consulted about trial strategy more credible than Petitioner's denial. (*Id.* at 20). She held that the "decision to present a 'warts and all' defense in which the defense had nothing to hide was a reasonable strategic choice, with which the client agreed." (ECF No. 8-22 at 28). Furthermore, by revealing that Petitioner was on parole and eligible for release within days of the crime, the jury could infer that Petitioner was not using drugs

and did not have a motive to commit the crime. (*Id.*).

Even "assuming for the purpose of argument only," that Petitioner's counsel was deficient in choosing to introduce Petitioner's parole status, Judge Bailey found that Petitioner did not meet the *Strickland* standard as he could not demonstrate that "'but for' the introduction of the parole status and conviction the result of the trial would have differed." (*Id.* at 29). Petitioner could not meet this burden, Judge Bailey explained, as the evidence introduced against Petitioner was "substantial." (*Id.*). He was "unequivocally identified by the victim, Mr. Nance," which alone provided enough evidence to sustain a conviction. (*Id.*). In addition to this identification, Petitioner's guilt was "corroborated by the witness at the clinic, by Curtis Wilson, and (reluctantly) by Gravely." Faced with this substantial evidence, Judge Bailey determined that Petitioner could not show the outcome of his trial would have been different without the alleged error of his attorneys. (*Id.*).

Judge Bailey next considered Petitioner's claims that his trial counsel displayed defective performance when they failed to request limiting instructions regarding impeachment evidence. (ECF No. 8-22 at 29). Judge Bailey noted that the recording between Mr. Gravely and Trooper Pettry would be admissible under West Virginia Rule of Evidence 613 as impeachment evidence. Moreover, the *tone* of the recording undercut Mr. Gravely's assertion that he was coerced into making his confession, and therefore introducing the recorded statement for that purpose would not be hearsay. (*Id.*). Additionally, Mr. Gravely made the same assertions in his guilty plea hearing while under oath and subject to cross examination; as such, these assertions could be introduced as substantive evidence. (*Id.* at 29-30). Therefore, both statements were admissible under the West Virginia Rules of Evidence. Judge Bailey added that, "defense counsel is not

required to make every objection if it is reasonably clear that the objection would not affect the final outcome of the trial." (*Id.* at 30) (quoting *State v. Hatala*, 176 W. Va. 435, 436-37 (1986)). As "the statements were clearly admissible, and no reasonable practitioner would have objected to their admissibility," Judge Bailey determined that Petitioner's trial counsel was not objectively deficient in declining to object to their admission. (*Id.* at 31).

As to defense counsel's decision not to request limiting instructions regarding the statements, Judge Bailey observed that, "defense counsel, faced with the difficult task of dealing with the damaging testimony of an accomplice, may not want to have a *Caudill* instruction because such an instruction could emphasize the damaging testimony." (*Id.* at 30) (quoting *State v. Flack*, 232 W. Va. 708, 713 (2013)). As defense counsel testified at the evidentiary hearing that he had declined to request limiting instructions for just this reason, as well as the additional reason that it would have conflicted with the defense's "'we have nothing to hide'" strategy, Judge Bailey found that the decision was a reasonable strategic determination. (ECF No. 8-22 at 30-31).

Judge Bailey stated that as Mr. Gravely's statements at the plea hearing were admissible as substantive evidence, and contained the same information as that in his statement to Trooper Pettry, any limiting instruction regarding the recorded statement would have had a minimal effect. (*Id.* at 32-33). Furthermore, a limiting instruction as to either the inconsistent statements, or to the weight to be given to the pleas of Petitioner's co-defendants, may have only had the result of calling attention to such damaging evidence. (*Id.*). Finally, Judge Bailey held that, again, the substantial evidence presented at trial undermined Petitioner's claim that the result would have been different without the alleged errors of his attorneys. (*Id.* at 34). Therefore, Judge Bailey determine that,

even assuming defense counsel should have requested a limiting instruction, Petitioner could not establish prejudice under the second *Strickland* prong. (ECF No. 8-22 at 34).

Judge Bailey dismissed Petitioner's claim that his attorneys erred in not objecting to the tattoo display. Judge Bailey considered that a display of tattoos as evidence is approved in West Virginia courts and, in any event, the Court had viewed the tattoos at the evidentiary hearing and had not been able to make out the prejudicial details described by Petitioner. (*Id.* at 34-35).

Judge Bailey next examined Petitioner's claim that his attorneys were ineffective in their presentation of expert witness, Dr. Clayman. (*Id.* at 36). Judge Bailey observed that:

> Although some of Dr. Clayman's testimony was not helpful to the defense (in fact may have been harmful in some particulars), through Dr. Clayman the defense got in front of the jury that eyewitness identification does result in a certain number of cases in misidentification, that the stress of being held at gunpoint can interfere with the 'coding' of information, and that the longer a person holds the belief that he has identified the correct person, the more difficult it is to convince the person he is wrong.

(*Id.* at 37). Judge Bailey stated that when faced with an unexpected eyewitness identification at trial, "counsel made a reasonable strategic decision to attempt to dissuade the jury that it should not credit the eyewitness identification. The fact that the strategy did not work does not mean that it was ineffective." (*Id.*). Therefore, Judge Bailey determined that defense counsel's performance in the presentation of the expert witness was not objectively deficient under the first *Strickland* prong. She also found that Petitioner could not meet the second prong as "[a]gain, absent Dr. Clayman's testimony the evidence against the petitioner was more than substantial." (ECF No. 8-22 at 37). Judge Bailey dismissed Petitioner's claim that his attorneys' handling of Dr. Clayman constituted ineffective assistance of counsel. (*Id.* at 38).

Judge Bailey turned to Petitioner's claim that the state impermissibly cross-examined him regarding his post-arrest silence and that his attorneys were ineffective in failing to challenge the questioning. (*Id.*). Judge Bailey determined that Petitioner did not in fact invoke his right to remain silent as the evidence showed he made multiple statements to the police asserting that he was innocent and requesting a lie detector test. (*Id.*). Judge Bailey found that trial counsel's decision not to object to this line of questioning was not deficient under the first prong of *Strickland*, because Petitioner "did not invoke his right to remain silent, but instead voluntarily engaged in a colloquy with the police;" consequently, the questioning was not improper. (ECF No. 8-22 at 40). Further, the decision not to object was in line with the strategy "already ... found to be reasonable" to "present everything and not hide anything from the jury." (*Id.* at 39-40).

As to the second *Strickland* prong, Judge Bailey found that the decision not to object was unlikely to influence the outcome at trial as the line of questioning "did not go to the substance of the offense" but instead attacked Petitioner's credibility which was "already ... severely damaged by the petitioner's lies on the stand about the phone call to his mother." (*Id.*). Finally, as above, Judge Bailey noted that the substantial evidence amassed against Petitioner at trial made it unlikely that the inaction by Petitioner's attorneys contributed to the result. Judge Bailey held that Petitioner failed to demonstrate prejudice as required by the second *Strickland* prong. (*Id.* at 40).

Judge Bailey next considered Petitioner's claim that his trial counsel provided constitutionally deficient performance by failing to present Paul Martin as an alibi witness or ask the Court for a continuance in his absence. (ECF No. 25-1 at 40). Judge Bailey stated that Mr. Martin's testimony would not have substantially assisted Petitioner's defense as the testimony he provided at the evidentiary hearing contradicted Petitioner's

version of events in some regards. (*Id.* at 40-41). Judge Bailey observed that trial counsel testified at the evidentiary hearing that he had discussed the issue with Petitioner and Petitioner decided he did not wish to ask for a continuance in light of Mr. Martin's unavailability. (*Id.* at 41). Judge Bailey stated that it was unlikely any such motion would have been granted as the trial was "virtually complete" and Mr. Martin's testimony was "cumulative at best." (*Id.*). Given these facts, Judge Bailey determined that defense counsel's decision not to ask for a continuance was not objectively deficient; therefore, Petitioner's claim failed to meet the first prong of *Strickland.* (ECF No. 25-1 at 42). Additionally, as the "jury considered and rejected 'alibi' testimony which came from sources far more credible than Martin," Judge Bailey found that Petitioner had not established prejudice under the second prong of *Strickland.* (*Id.*).

Finally, Judge Bailey dismissed Petitioner's claim that the cumulative effect of trial counsel's errors resulted in a constitutionally deficient trial. (*Id.*). Judge Bailey explained that the doctrine of cumulative error is only applicable when there is a legal or factual basis to support individual claims of error. (*Id.*). Because the Court "carefully considered each of the asserted claims of ineffective assistance of counsel and determined that as to each claim, counsel's performance was neither objectively deficient, nor did any error or omission affect the result of the proceeding," Judge Bailey found that the doctrine of cumulative error did not apply. (*Id.* at 43). In sum, Judge Bailey denied Petitioner's claim for habeas relief. (*Id.* at 43-44).

Petitioner appealed this decision to the WVSC on January 3, 2017. (ECF No. 8-23). In his appeal, Petitioner challenged the circuit court's decision on the following grounds:

A. Whether the Petitioner was denied his right to effective assistance of counsel under the state and federal constitutions as a result of:

30

1. The introduction of prior felony conviction, parole status, and other bad character evidence by defense counsel at trial.

2. Counsel's failure to object to the use of impeachment evidence as evidence of guilt and failing to request a "*Caudill*" instruction as to the proper weight to be given to a guilty plea by a co-defendant.
3. Failure of counsel to object to the display of robbery tattoo of the petitioner.

4. Failure of counsel to investigate testimony of psychologist, Dr. Clayman, which resulted in the presentation of prejudicial testimony against the Petitioner.

5. Failure of counsel to present alibi witness.

6. Failure to object to the state commenting upon the Petitioner's post arrest *Miranda* silence.

7. Cumulative effect of counsel's error.

B. *Apprendi* Violation of Sixth Amendment Right to Trial by Jury.

C. The lower court erred in its determination of the existence of mitigating factors under W.Va. Code § 61-2-14a (b) (3), (4).

(*Id.* at 7). Respondent filed a response brief asking asked the WVSC to affirm the circuit court's denial of Petitioner's habeas action. (ECF No. 8-24 at 6).

On October 20, 2017, the WVSC affirmed the decision of the circuit court in a memorandum decision. (ECF No. 8-25 at 2). With regard to Petitioner's claim that the lower court erred in its assignment of mitigating factors at sentencing, the WVSC held that as "this claim has been previously adjudicated, and rejected, in petitioner's direct appeal of his conviction and sentence to this Court," Petitioner was not entitled to relief. (*Id.* at 5). The WVSC declared that with respect to Petitioner's remaining claims for relief, it discovered no "error or abuse of discretion by the circuit court." (*Id.*). Given that, "[o]ur review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief," as well as the "well-reasoned findings and conclusions"

in the circuit court's order, the WVSC elected to "adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised herein" and affirmed the lower court's decision. (*Id.* at 5-6).

Petitioner filed the instant § 2254 petition in May 2018. (ECF No. 2). In the petition, Petitioner asserts two grounds for relief. Under ground one, Petitioner alleges that his trial attorneys provided ineffective assistance of counsel in violation of Petitioner's Sixth and Fourteenth Amendment Due Process rights. (*Id.* at 6). In support of this allegation, Petitioner puts forth the following six sub-claims:

> 1. Defense Counsel Introduced Petitioner's Prior Felony Conviction, Parole Status, And Other Bad Character Evidence At Trial. (ECF No. 2 at 6);
>
> 2. Defense Counsel Failed To Object To The Use Of Impeachment Evidence As Evidence Of Guilt And Failing To Request A '*Caudill*' Instruction As To The Proper Weight To Be Given To A Guilty Plea By A Co-Defendant. (*Id.* at 7);
>
> 3. Defense Counsel Failed To Investigate And Prepare For The Testimony Of Dr. David Clayman Regarding Unreliability Of Eyewitness Testimony. (*Id.* at 8);
>
> 4. Defense Counsel Failed To Present Alibi Witness Paul Martin. (*Id.* at 9);
>
> 5. Defense Counsel Failed To Object To The State's Questioning The Police Regarding Petitioner's Post Arrest/Miranda Silence. (*Id.*);
>
> 6. The Cumulative Errors Of Defense Counsel Violated The Petitioner's Right To Effective Assistance Of Counsel. (*Id.*).

As his second ground for relief, Petitioner contends that his right to a trial by jury, as guaranteed by the Sixth Amendment, was violated when the Court imposed a sentence based upon facts that were neither found by the jury, nor admitted by Petitioner. (*Id.* at 11). Petitioner points out that West Virginia's kidnapping statute imposes a life sentence, but the sentence is reduced by statute when certain mitigating factors are present. (*Id.* at

12). Petitioner argues that "the existence of mitigating factors to determine [a] sentence creates a legal right to have a jury determine them." (*Id.*). For relief, Petitioner requests that this Court either vacate his conviction, or void his sentence and remand the case to the Circuit Court of Kanawha County for resentencing. (*Id.* at 17).

In July 2018, Respondent filed a Response to Petitioner's § 2254 claim. (ECF No. 9). In the Response, Respondent concedes that Petitioner's habeas petition is timely and that he has properly exhausted his state remedies. (*Id.* at 1-2). Respondent denies that Petitioner's claims have merit, however, and asks this Court to dismiss Petitioner's § 2254 motion. (*Id.* at 3). Contemporaneous to the Response, Respondent filed a Motion for Summary Judgement and supporting Memorandum. (ECF No. 8, 10).

In the Supporting Memorandum, Respondent argues that Petitioner's claims do not meet the standards of review required by the law governing § 2254 claims. Respondent argues that, as to Petitioner's claims of ineffective assistance of counsel, the WVSC clearly applied the correct law in considering Petitioner's claims under the *Strickland* standard. (ECF No. 10 at 22). As the WVSC recognized and applied the correct legal standard to Petitioner's claims, Petitioner can only succeed on these claims if he shows that the state courts' application of the law was "unreasonable." (*Id.* at 23). Respondent argues that Petitioner cannot meet this burden on any of his six claims of ineffective assistance. (*Id.* at 23-29).

Respondent similarly argues that Petitioner's claim that his Sixth Amendment right to trial by jury was violated fails as a matter of law. (*Id.* at 31). Respondent states that the WVSC has already decided the issue raised by Petitioner and determined that the kidnapping statute comports with constitutional requirements. (*Id.* at 30). Respondent additionally points to a case decided in this Court that he believes supports his argument.

33

(*Id.* at 31) (citing *Rabb v. Ballard,* No. 2:09-cv-0159, 2011 WL 1299354, at *2-6 (S.D.W. Va. Mar. 31, 2011)). Respondent asks that this Court grant its motion for summary judgment and dismiss Petitioner's § 2254 claim for relief. (*Id.*).

In September 2018, Petitioner filed an Objection to Respondent's Motion for Summary Judgment. (ECF No. 18). In the Objection, Petitioner rejects Respondent's argument that the evidence in his trial was "overwhelming," and argues that "the evidence was anything but overwhelming." (*Id.* at 4). Petitioner further contends that Respondent's reliance on earlier state court opinions to refute his Sixth Amendment argument is "misplaced" as the controlling law has changed since the opinion was issued. (*Id.* at 5). Petitioner asserts that the Supreme Court decision in *Alleyne v United States,* 570 U.S. 99 (2013) established that any element which increases the "floor" of punishment as well as the "ceiling" must be found by the jury and not a judge. (*Id.*). Petitioner maintains that West Virginia's kidnapping statute violates this prohibition. (*Id.* at 16-17). Petitioner additionally refutes Respondent's assertion that the state courts' application of *Strickland* was reasonable, arguing that, due to a variety errors and oversights, the state courts failed to apply *Strickland* in a manner that satisfies even the deferential standards of review applicable here. (*Id.* at 18).

## II.   <u>Standard of Review</u>

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in State custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which

provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

> (1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Moreover, the factual determinations made by the state court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker*, 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams*, 529 U.S. at 405) (internal quotations omitted). The district court may grant a habeas writ under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme]

Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300–01 (internal marks omitted). Accordingly, the AEDPA limits the federal habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 365.

Here, Respondent moves for summary judgment. (ECF No. 8). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). The court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In addition, only genuine disputes over material facts "will properly preclude the entry of

summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party, as it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249–50).

## III.   Discussion

As noted above, Petitioner's § 2254 Petition asserts two grounds for relief, with his claim of ineffective assistance of counsel consisting of six sub-claims. Each claim is considered below, in turn.

### A. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate ... defects in assistance that have no probable effect

37

upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor*, 535 U.S. 162, 166 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

As Petitioner is raising his claim of ineffective assistance of counsel in a § 2254 petition, his claims must overcome both the *Strickland* standard, and the barrier to review imposed by § 2254(d), resulting in review that is "doubly" deferential to the decision of the state court. *Knowles v. Mirzayance*, 556 U.S. 111, 129 (2009). In *Harrington v. Richter*, the Supreme Court made clear that relief in these circumstances should be granted only sparingly. 562 U.S. 86, 102 (2011). In *Harrington,* the Supreme Court reviewed and reversed a decision by the Ninth Circuit to grant relief to a petitioner raising ineffective assistance of counsel claims in a § 2254 petition. *Id.* The *Harrington* Court clarified that the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." 562 U.S. at 101. A state court's

determination that trial counsel was not defective can not be overturned in federal habeas review unless "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. This is because for the "purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Id.* at 101 (quoting *Williams,* 529 U.S. at 410). "If this standard is difficult to meet, that is because it was meant to be." *Harrington,* 562 U.S. at 102. Habeas review under § 2254(d) is intended to function as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-103.

Likewise, "[s]urmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington*, 562 U.S. at 105. It is not enough that trial counsel's performance may have "deviated from best practices or most common custom" as "the question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms.'" *Strickland*, 466 U.S., at 690. Thus, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington,* 562 U.S. at 102, 105. To succeed in establishing his claim of ineffective assistance of counsel, Petitioner must contend with this demanding standard articulated by the Supreme Court.

### 1. Prior Conviction and Parole Status

Petitioner asserts that his counsel's decision to elicit testimony about Petitioner's prior conviction and parole status constituted ineffective assistance of counsel. (ECF No.

2 at 6). Petitioner criticizes defense counsel's "conscious decision to present evidence to the jury regarding Petitioner's criminal history" which Petitioner argues was "not a reasonable 'strategic decision' because the evidence gave the State a tactical advantage which it otherwise would not have had." (ECF No. 2 at 6-7).

Petitioner does not explicitly state whether he believes the state courts' decisions should be overturned under the "contrary to" or "unreasonable application" prong of § 2254(d)(1). Nor does he appear to challenge the state courts' determination of facts under § 2254(d)(2). In considering under which standard to review the state courts' decisions, the undersigned will note that the state courts considered every one of Petitioner's claims of ineffective assistance of counsel under the *Strickland* standard. It is beyond dispute that the *Strickland* ineffectiveness standard is clearly established federal law. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 391 (2000) ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'"). Accordingly, the state courts clearly identified and applied the correct federal law regarding these claims; therefore, to succeed, Petitioner must show that the state courts' determination involved an "unreasonable application" of the *Strickland* standard. *See Boothe v. Ballard*, No. 2:14-CV-25165, 2016 WL 1275054, at *21 (S.D.W. Va. Mar. 31, 2016), *aff'd*, 670 F. App'x 193 (4th Cir. 2016).

This Court has had occasion to consider a state prisoner's claim that his attorney's conscious decision to introduce prior conviction and parole evidence constituted ineffective assistance of counsel. *Samples v. Ballard*, No. 2:14-CV-15413, 2016 WL 1271508, at *9 (S.D.W. Va. Mar. 31, 2016), *aff'd*, 860 F.3d 266 (4th Cir. 2017). In *Samples*, the petitioner's attorney testified that he revealed petitioner's status as a felon because he wished "to get out in front of and minimize the issue" as well as to suggest that petitioner

had been in hiding due to a parole violation, not because he had committed the crime he was charged with. *Id.* This Court upheld the decision by the trial attorney as introducing the prior conviction as a "considered decision" and not objectively unreasonable. *Id.* This decision is in line with other lower court opinions that have found introduction of prior conviction and parole status a reasonable strategy in a variety of circumstances. *See e.g. Lewis v. Stephens*, No. CIV.A. H-13-3527, 2014 WL 2759071, at \*10 (S.D. Tex. June 17, 2014) (finding strategy not unreasonable where "counsel's actions were not due to unawareness or incompetence but rather calculated to not draw unnecessary attention to a non-responsive answer."); *see also Mackendrick v. Sec'y, Fla. Dep't of Corr.*, No. 4:11CV460-WS, 2014 WL 4681760, at \*10 (N.D. Fla. Sept. 19, 2014) (counsel's "strategy was to have [p]etitioner testify about his prior offenses so that the jury would know that none of them were for sexual offenses.").

In this case, Petitioner's trial counsel testified at the state habeas proceeding that he introduced Petitioner's status as a parolee for two reasons: 1) to show that Petitioner had no incentive to commit a crime so close in time to his release from parole, and 2) to show that he had been regularly tested for drug usage due to his parole status and, consequently, was less likely to steal prescription drugs. (ECF No. 8-21 at 29-30). Petitioner's trial counsel also explained that the decision was consistent with the defense's trial strategy that Petitioner "had nothing to hide." (*Id.*).

Petitioner argues that the first rationale is significantly undermined by the fact that defense counsel unwittingly elicited testimony that Petitioner had in fact broken parole terms close to his release date by leaving the State of West Virginia. (ECF No. 2 at 7). While this argument may have some merit, the introduction of Petitioner's parole status to show that Petitioner had not been using drugs and, as a result, was not likely to

participate in a robbery of prescription drugs, was nonetheless a reasonable strategy. Therefore, the undersigned **FINDS** that the state courts' determination that trial counsel's decision was a reasonable strategic choice was not an objectively unreasonable application of federal law.

Additionally, Petitioner cannot overcome the strong deference owed to the state courts' determination that Petitioner failed to establish that he was prejudiced under the second *Strickland* prong on this issue. *See, e.g., Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011) ("[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.'" (quoting *Strickland v. Washington*, 466 U.S. 668, 696 (1984)). The state courts determined that the evidence submitted to prove Petitioner's guilt was substantial. Indeed, Mr. Nance's testimony alone was sufficient to convict Petitioner. In contrast, the evidence regarding his prior conviction and parole was insignificant on the issue of guilt; that evidence proved only that Petitioner had a history of one non-violent felony and such good behavior on probation that he was about to be released. Accordingly, the state courts concluded that the evidence regarding his prior conviction and parole did not contribute to the verdict; as such, Petitioner could not show that it was likely the outcome of the trial would have been different without the alleged error. (ECF No. 8-22 at 29).

The state courts' conclusion is not so obviously incorrect as to be "beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. The evidence of Petitioner's parole status was not unequivocally damaging as it tended to show a lack of motive, moreover the prior felony was not robbery or drug related and thus less likely to lead to an impermissible inference from the jury. *See e.g., Mackendrick* No. 4:11-CV-460-

42

WS, 2014 WL 4681760, at *9 (prior conviction evidence is less damaging where prior conviction is for a separate crime). Therefore, the undersigned **FINDS** that Petitioner has failed to show the state courts' determination that trial counsel was not constitutionally defective in this regard was improper under § 2254(d).

### 2. Failure to Object to Impeachment Evidence and Failure to Request a Caudill Instruction

While Petitioner frames this ground for relief as one challenge, it is actually comprised of three distinct allegations of ineffective assistance: (i) that trial counsel failed to object to the improper introduction of statements, (ii) that trial counsel failed to request a limiting instruction regarding those statements, and (iii) that trial counsel failed to request a *Caudill* instruction regarding the testimony of the co-defendants.

#### i. Failure to object to admission of statements

Petitioner asserts that the prior statements made by Mr. Gravely, which were introduced at trial, constituted improper hearsay evidence. He argues that his counsel's failure to object to the introduction of the statements, or, barring that, to request a limiting instruction, constituted ineffective assistance of counsel. (ECF No. 2 at 8). Petitioner argues that Mr. Gravely's statements to police officers did not meet the requirements of West Virginia Rule of Evidence 801(d)(1)(A) and could not be introduced as substantive evidence. Petitioner further contends that his attorneys should have challenged the admission of the inconsistent statements as impeachment evidence under West Virginia Rule of Evidence 607 in order to initiate a balancing test under Rule 403. (ECF No. 18 at 11).

The determination by the state courts that trial counsel's performance in this regard was not objectively deficient was not unreasonable. As the state courts noted, Mr.

Gravely's statements made during the plea hearing were admissible under West Virginia Rule of Evidence 801(d)(1)(A). (ECF No. 8-22 at 31). Under Rule 801(d)(1)(A), a prior inconsistent statement made by a witness can be used as substantive evidence if "the declarant testifies and is subject to cross-examination" regarding the prior statement, and the prior statement "was given under penalty of perjury at a trial, hearing, or other proceeding." W. Va. R. Evid. 801.

Mr. Gravely testified at Petitioner's trial and was subject to cross examination. The statements he made during his plea hearing which implicated Petitioner in the crime were inconsistent with his testimony at trial, and, as they were made in the course of a plea hearing, they were subject to perjury and made during a "hearing" as required by the rule. Given that an objection to the introduction of these statements would likely have been futile, trial counsel was not deficient in declining to do so, and the state courts were not unreasonable in rejecting Petitioner's claim.

As to the statements Mr. Gravely made to Trooper Pettry, it is true that these did not meet the requirements of Rule 801(d)(1)(A). *See State v. Moore,* 189 W. Va. 16, 22 (1992). However, as the state courts noted, the statements were likely admissible for impeachment purposes, as a prior inconsistent statement under Rule 613. *See e.g. State ex rel. Waldron v. Scott*, 222 W. Va. 122, 127, (2008) ("The case law is clear that prior inconsistent statements are a matter for cross examination and impeachment."). Therefore, the undersigned **FINDS** that the state courts' determination that defense counsel was not deficient in declining to make what would likely be a futile challenge to the statements' admission in order to maintain the defense strategy that Petitioner had nothing to hide was not objectively unreasonable.

*ii. Failure to Request a Limiting Instruction*

Petitioner additionally contends that defense counsel should have requested a limiting instruction regarding the use of impeachment evidence. (ECF No. 2 at 8). When cross-examined about this issue at the hearing, Petitioner's counsel indicated that the decision not to request a limiting instruction was made in order to avoid highlighting the testimony and so as not to damage the credibility of witnesses whose testimony was otherwise favorable to Petitioner, as well as to conform with counsel's overall strategy of appearing open and honest. (ECF No. 25 at 43-45). The state courts found the rationale described by defense counsel to constitute "sound strategic reasons" for declining to request a limiting instruction. (ECF No. 8-22 at 31-32). This Court has similarly recognized that "lawyers often make the strategic choice not to request limiting instructions, because they wish to avoid underscoring the troublesome material for the jury." *Samples*, No. 2:14-CV-15413, 2016 WL 1271508, at *10 (quoting *United States v. Lindsay*, 157 F.3d 532, 536 (7th Cir. 1998)). The reasoning cited by defense counsel at the evidentiary hearing would support a finding that counsel's performance was within the range of competency contemplated by the *Strickland* standard.

In any event, the state courts additionally determined that, even assuming the decision to not request a limiting instruction was an error, Petitioner could not show that the outcome of the trial was prejudiced by the error. (*Id.* at 32). This decision was based on the fact that the statements made to Trooper Pettry contained the "exact same information" as the statements made during the plea hearing which could be considered as substantive evidence. (*Id.* at 33). Given this fact, any limiting instruction would have had a minimal effect as the jury would still be free to consider information of similar evidentiary value.

This Court has previously determined that § 2254 relief for a claim of ineffective assistance of counsel is inappropriate when defense counsel declines to request a limiting instruction, even when defense counsel admitted he failed to so for any strategic advantage, but did so by oversight. *Samples*, No. 2:14-CV-15413, 2016 WL 1271508, at *10. As the jury was free to consider as substantive evidence the same factual information, coming from the same witness, as that at issue here, the state courts' determination that Petitioner failed to show any prejudice resulting from the absence of a limiting instruction on the recorded statements is well supported by the record. Moreover, the jury instructions did contain a limiting instruction that, while not directly addressing Mr. Gravely's statements, did warn against considering contradictory witness statements as substantive evidence. (ECF No. 8-4 at 188). Therefore, the undersigned **FINDS** that the state courts did not render a decision that was "an unreasonable application of" *Strickland* by finding that defense counsel's performance in this regard was not constitutionally deficient. 28 U.S.C. § 2254(d)(1).

### iii. Failure to Request a Caudill instruction

Petitioner argues that trial counsel was ineffective by failing to request a *Caudill* instruction informing the jury of the "caution they should use in evaluating the evidentiary value of guilty pleas by co-defendants." (ECF No. 2 at 8). The WVSC has held that when a co-defendant, who has pled guilty to the crime charged against the defendant, testifies at trial, the defendant is entitled to a limiting instruction informing the jury that the co-defendant's guilty plea should not be used as substantive evidence of the defendant's guilt. *State v. Caudill*, 170 W.Va. 74 (1982). Such an instruction was neither requested, nor given in this case. Petitioner contends the lack of a *Caudill* instruction was not a strategic decision, but was a costly oversight by counsel that led to his conviction.

The state courts rejected Petitioner's claim, noting that the same reasoning for not requesting a limiting instruction regarding impeachment evidence applied to a *Caudill* instruction. (ECF No. 8-22 at 33). Of the three convicted co-defendants who testified, two offered testimony that bolstered Petitioner's defense. Defense counsel testified at the evidentiary hearing that the "last thing we wanted to do was to create any negative connotations toward either one of those witnesses." (ECF No. 25 at 44-45). As the testimony by Mr. Gravely and Ms. Sampson represented some of the most persuasive exculpatory evidence presented at trial, declining to ask for an instruction directing the jury to discount their credibility in any manner was a sound strategic decision.

As to the testimony of Mr. Wilson, the state courts pointed out that the WVSC had previously held there are sound strategic reasons why defense counsel may determine not to request a *Caudill* instruction, as this might have the result of emphasizing the damaging testimony. The state courts determined that defense counsel's decision not to request a *Caudill* instruction was not objectively deficient. (ECF No. 8-22 at 33). The state courts additionally found that, even assuming the decision did meet the first prong of *Strickland,* it failed to satisfy the second prong, as Petitioner could not demonstrate prejudice. (*Id.* at 33-34).

The state courts' determination was not objectively unreasonable. Given that the testimony of Petitioner's co-defendants was mostly helpful, and Ms. Sampson and Mr. Gravely specifically testified that Petitioner was not involved in the crime, a *Caudill* instruction would probably have been more confusing to the jury than beneficial to the defense. There simply was no need to comment on the effect of the co-defendants' guilty pleas when two of them were exonerating Petitioner. Moreover, this approach was consistent with defense counsel's overall strategy of appearing open and honest before

the jury. Therefore, the undersigned **FINDS** that the state courts' determination that Petitioner's counsel was not constitutionally deficient in failing to request a *Caudill* instruction was not an objectively unreasonable application of federal law.

### 3. Defense Counsel's Presentation of Dr. Clayman

Petitioner next argues that defense counsel's lack of preparation and investigation regarding Dr. Clayman's testimony constituted deficient performance. (ECF No. 2 at 7). Petitioner contends that Dr. Clayman's testimony was "devastating to Petitioner and basically bolstered the testimony of the State's key witnesses." (ECF No. 18 at 11).

The state courts indicated that, while some of Dr. Clayman's testimony was not helpful to the defense and may have in fact been harmful, defense counsel was able to establish through Dr. Clayman significant exculpatory evidence as well. (ECF No. 8-22 at 37). The state courts additionally found that the decision to call Dr. Clayman was based on unexpected developments at trial and that Petitioner agreed to the decision. (*Id.* at 37-38). The state courts therefore determined that as "perfection is not the standard for ineffective assistance of counsel," trial counsel had sufficiently prepared Dr. Clayman to testify, and counsel's performance in presenting Dr. Clayman as an expert witness was not constitutionally deficient. (*Id.*) (internal quotation marks omitted). The state courts also determined that as Dr. Clayman's testimony was "helpful in many respects" to Petitioner, he could not overcome the prejudice prong of the *Strickland* test. (*Id.* at 38).

Defense counsel testified at the evidentiary hearing that the decision to employ Dr. Clayman was precipitated by unanticipated and damaging eyewitness testimony that came out during the trial. (ECF No. 8-21 at 31). Petitioner's counsel testified that he had spoken with Dr. Clayman "in general" about the facts of the case and questioned him regarding the hypothetical question posed at trial prior to calling Dr. Clayman to the

stand. (*Id.* at 35, 37). Petitioner's counsel stated he was "disappointed" by Dr. Clayman's response to the hypothetical question. (*Id.* at 37).

The Fourth Circuit has been hesitant to grant § 2254 relief when the petitioner complains of defense counsel's defective use of expert witnesses. In *Moore v. Hardee*, the Fourth Circuit overturned a lower court decision granting a § 2254 petition where defense counsel failed entirely to call an expert witness in a case that rested largely on eyewitness identification. 723 F.3d 488, 496 (4th Cir. 2013). The Fourth Circuit stated that "in light of our doubly deferential standard of review," it was not able to conclude that the state court's determination to the contrary was unreasonable. *Id.* at 497. Similarly, in *Wright v. Angelone*, the Fourth Circuit declined to find unreasonable a state court's determination that trial counsel had not been deficient when he called an expert witness, who, undiscovered by trial counsel, had co-authored a study which directly contradicted the defense's theory. 151 F.3d 151, 161-162 (4th Cir. 1998). The Fourth Circuit noted that "[a]lthough portions of [the expert witness] testimony were less than favorable" to the petitioner, defense counsel had been able to present some beneficial information through the presentation of the expert witness. *Id.* at 162. The Fourth Circuit thus declined to find that the state court's determination was an unreasonable application of the *Strickland* standard. *Id.*

Mindful of the admonishment by the Supreme Court not to allow the benefit of hindsight to alter review of counsel's performance, *Wiggins* 539 U.S. at 523, as well as the substantial deference given to state courts, the undersigned cannot conclude that the state courts' determination that counsel's performance was within the standard established by the Sixth Amendment in this regard was unreasonable or contrary to federal law. Counsel testified that he and Petitioner only decided to call Dr. Clayman due to unexpected and

damaging testimony by witnesses whose recollections at trial had improved since their earlier statements. (ECF No. 8-21 at 31). As a result, defense counsel had much less time to prepare and assess the expert witness than was typical. Nonetheless, defense counsel testified he interviewed Dr. Clayman the night before his testimony and at least "in general" provided him with the facts of the case. (*Id.* at 32, 33, 35-36). Defense counsel explained that they "had problems" at that point in the case with the strength of the eyewitness testimony, which forced them to call Dr. Clayman for "some sort of an explanation" about the known weaknesses of eyewitness identifications. (*Id.* at 36). "This is the very type of strategic or tactical decision that trial counsel must often make in a criminal case and is not a proper basis for an ineffective assistance of counsel claim. *Person v. Rawski*, No. CV 4:15-4606-RMG, 2017 WL 1319778, at \*6 (D.S.C. Apr. 10, 2017), *dismissed,* 692 F. App'x 147 (4th Cir. 2017). Therefore, the undersigned **FINDS** that the state courts' determination that trial counsel was not objectively deficient in this regard was not an unreasonable application of the relevant federal law.

The state courts' determination that Petitioner failed to show prejudice under the second prong of *Strickland* on this issue was likewise not an unreasonable determination. In *Angelone,* the Fourth Circuit declined to find prejudice under *Strickland* when the defense expert witness held views that were directly antagonistic to the defense's theory, when at least some of the evidence he presented was still helpful for the defense. 151 F.3d at 162. Here, as the state courts recognized, Dr. Clayman's testimony was "helpful in many respects" to Petitioner's defense. (ECF No. 8-22 at 38). Through Dr. Clayman's testimony, the jury learned that eyewitness identifications should be considered with skepticism, because of their potential for inaccuracy. Dr. Clayman emphasized the scientific literature, which showed that high-stress circumstances surrounding a memory could

potentially have a negative effect on the reliability of the memory and an initially inaccurate memory could quickly become reinforced and strengthen over time. (ECF No. 8-4 at 117-118, 120, 123). Therefore, based on the fact that defense counsel's presentation of Dr. Clayman did introduce beneficial evidence, the undersigned **FINDS** that the state courts' conclusion that Petitioner could not show prejudice under *Strickland* was not objectively unreasonable.

### 4. Defense Counsel's Failure to Present an Alibi Witness

Petitioner next argues that his defense counsel's failure to call witness Paul Martin to the stand constituted ineffective assistance of counsel. (ECF No. 2 at 9). Petitioner criticizes defense counsel's "inexplicable" failure to call Mr. Martin despite repeatedly referencing him in front of the jury. (*Id*). As to Respondent's argument that Mr. Martin's testimony would not have been beneficial to Petitioner as he contradicted Petitioner's account of the night, Petitioner argues that Mr. Martin's memory would "have undoubtedly been fresher" if he had testified at trial rather than at the evidentiary hearing. (ECF No. 18 at 13). Petitioner accuses Respondent of "trying to mislead this Court" in the matter. (*Id.*).

The state courts considered and rejected Petitioner's claim that his counsel provided ineffective assistance by not asking for a continuance so that Mr. Martin could testify. The state courts based this decision largely on the discrepancies between Mr. Martin's testimony at the habeas proceeding and Petitioner's testimony at trial. The state courts found that Mr. Martin's account of taking a taxi home to change then returning to Petitioner's residence to remain constantly with him during the relevant time period was simply not credible. (ECF No. 25-1 at 41). However, the state courts also noted that it was "questionable" whether a continuance motion would have been granted, and that

51

evidence regarding Petitioner's trip to Ohio had been presented through other witnesses, so Mr. Martin's testimony was cumulative. (*Id.* at 41). Considering all of these factors, the state courts determined that counsel's decision to proceed without Mr. Martin's testimony was not objectively deficient, and Petitioner was additionally unable to establish prejudice flowing from that decision. (*Id.* at 42). The undersigned agrees.

Mr. Martin testified at the habeas proceeding that he accompanied Petitioner to Columbus, Ohio the weekend before the crime; they arrived back at Petitioner's home in West Virginia at 2:00 a.m. on Tuesday, April 27, 2010; Mr. Martin took a cab to his house to collect some clothing; and approximately an hour later, he returned to Petitioner's house and stayed with Petitioner through the afternoon of April 27. However, this testimony was inconsistent with Petitioner's testimony at trial. At trial, Petitioner testified that he took Mr. Martin home from Columbus on the morning of April 27, 2010 and then went to his own home, arriving at around 2:00 a.m. At the habeas proceeding, Petitioner reiterated that he took Mr. Martin home, then Petitioner went home alone, and did not see Mr. Martin again until 10:00 or 11:00 the next morning. Consequently, if Mr. Martin had testified consistently with Petitioner at the time of the trial, Mr. Martin would have, at most, provided a partial alibi, since he would not have been with Petitioner at the time the crime was committed.

The Fourth Circuit has rejected a lower court's decision to grant § 2254 relief where the district court "did not afford the proper level of deference to the [state court's] factual finding that trial counsel's interviews with the alibi witnesses 'only established an incomplete or partial alibi for [the petitioner] and did not give him an alibi for the actual time of the alleged incident.'" *Boseman v. Bazzle*, 364 F. App'x 796, 807 (4th Cir. 2010) (unpublished decision). In a factually similar case, a court in this circuit declined to grant

§ 2254 relief where the petitioner argued trial counsel was constitutionally deficient for failing to ask for a continuance after an alibi witness fell ill, when the petitioner was able to present the alibi defense through other witnesses, and the excluded witness could offer only a partial alibi defense. *Teamer v. Lewis*, No. CV 6:16-3340-PMD-KFM, 2017 WL 9292250, at *9 (D.S.C. June 28, 2017), *report and recommendation adopted*, No. 6:16-CV-3340-PMD-KFM, 2017 WL 4160972 (D.S.C. Sept. 20, 2017).

Here, the state courts' determination that counsel's decision did not fall below the level of performance contemplated by the Sixth Amendment was not objectively unreasonable. Assuming *arguendo* that Mr. Martin testified at trial and that his testimony matched Petitioner's version of events, his testimony would not have been vital to Petitioner's case. Other witnesses testified regarding Petitioner's trip to Ohio and his return to West Virginia in the early morning hours of April 27, 2010, so, as the state courts pointed out, this testimony was cumulative. Contrary to Petitioner's contention in his brief, (ECF No. 18 at 13), Mr. Martin would not have provided Petitioner with an alibi for the crime, as the kidnapping and robbery happened between 8:00 and 9:00 a.m. According to Petitioner's own testimony, he and Mr. Martin separated before 2:00 a.m. on April 27, 2010 and did not see each other again until sometime after 10:00 a.m. (ECF No. 8-21 at 18). Consequently, Mr. Martin was not with Petitioner at the time the crime was committed.

Moreover, as Mr. Martin was a very close friend of Petitioner and an ex-convict, his testimony would not have been substantially more credible than the other witnesses; Petitioner's girlfriend, brother, and Petitioner himself, who testified about the Ohio trip. Having duplicative testimony regarding a partial alibi would not have established Petitioner's inability to commit the crime; therefore, the undersigned **FINDS** that the

state courts were not objectively unreasonable in finding that counsel's decision to proceed without Mr. Martin's testimony fell within the wide range of acceptable assistance of counsel.

Furthermore, the state courts determined that Petitioner did not satisfy the prejudice prong in this regard as it was "questionable" whether any request for a continuance would have been granted given that the trial was almost complete and Petitioner's trip to Ohio had been established through the testimony of other witnesses. (ECF No. 25-1 at 41). Considering that the habeas court decision, later incorporated by the WVSC, was written by the judge who oversaw Petitioner's trial, her conclusion that a continuance was unlikely to be granted carries significant weight. (ECF No. 8-22 at 2).

The request for a continuance is a matter within the sound discretion of the trial Court. *See Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *see also, United States v. Schembari*, 484 F.2d 931, 934 (4th Cir. 1973). In *Ungar*, the Supreme Court established the standard of review for a trial Court's denial of a motion for a continuance:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar*, 376 U.S. at 589. (citations omitted). Generally, when a habeas petitioner requests relief for counsel's failure to request a continuance, he must show that a continuance likely would have been granted in order to establish the second *Strickland* prong. *See Joe v. Padula*, No. CIV.A. 9:11-1090-TLW, 2012 WL 2339634, at *7 (D.S.C. Mar. 1, 2012),

54

*report and recommendation adopted*, No. 9:11-CV-1090-TLW-BM, 2012 WL 2325662 (D.S.C. June 19, 2012) (no prejudice where petitioner could not show continuance would have been granted) *see also Teamer,* No. CV 6:16-3340-PMD-KFM, 2017 WL 9292250, at *9 ("There can be no prejudice from trial counsel's failure to request a continuance unless the trial court's refusal to grant the continuance would have been an abuse of discretion."). Therefore, because, as discussed above, Mr. Martin's testimony would not have substantively changed the weight of the evidence regarding Petitioner's alibi defense, as well as the fact that Petitioner has not shown a continuance likely would have been granted if it was requested, the undersigned **FINDS** that Petitioner fails to show that the state courts' decision that he did not establish prejudice on this claim was an unreasonable application of federal law as required by § 2254(d).

### 5. *Counsel's Failure to Object to Impermissible Questioning Regarding Post-Arrest Silence.*

Petitioner claims that his counsel's failure to object when the State questioned Petitioner on the witness stand about his lack of communication with police officers constituted ineffective assistance of counsel. (ECF No. 2 at 9). Petitioner contends that he invoked his right to silence when he refused to communicate with police officers beyond telling them that he did not commit the crime and wanted a lie detector test. (ECF No. 18 at 14). He argues that the State's questioning of his decision to remain silent was a violation of his constitutional rights; therefore, his attorneys' failure to object to the questioning was constitutionally deficient assistance. (*Id.* at 15). Respondent asserts that because Petitioner did not invoke his right to remain silent with law enforcement, there was no violation by the prosecutor in asking Petitioner about his communications with the officers, and no basis for an objection. (ECF No. 10 at 28).

The state courts reviewing this claim determined that Petitioner did not in fact invoke his right to silence. (ECF 8-22 at 38). At the habeas hearing, Petitioner testified that he only communicated with the police to express his wish to take a lie detector test and to deny that he committed the robbery. Petitioner allowed that it was possible he had expressed these statements more than once to police officers. (ECF No. 8-21 at 19). The state courts concluded that, since Petitioner was not silent and did not invoke his right to remain silent, the cross-examination regarding his failure to tell police about his alibi was not improper. (ECF No. 8-22 at 38).

Furthermore, the state courts noted that defense counsel's decision not to object to the line of questioning was consistent with the defense strategy of avoiding the appearance that Petitioner was attempting to hide information from the jury. (*Id.*). The state courts determined that defense counsel was not deficient under *Strickland* as any objection to the questioning would likely have been overruled. (*Id.* at 39-40). The state courts additionally held that, even assuming an error, Petitioner could not show prejudice as the evidence amassed against Petitioner was substantial and the questioning only served to damage Petitioner's credibility, which was already weakened by Petitioner's attempt to lie on the stand about phone calls made to his mother. (*Id.*).

In *Miranda v. Arizona*, the Supreme Court established that when a person is in the custody of law enforcement officers, statements he makes may not be used against him unless the State can show that the defendant waived his constitutional right to silence "voluntarily, knowingly and intelligently." 384 U.S. 436, 444–45, (1966). The Supreme Court later clarified that it was impermissible to use a defendant's post-arrest silence in order to impeach a defendant's testimony at trial. *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). In order for an individual to successfully invoke their constitutional right to silence so

that they receive the constitutional protections against impeachment it affords, the defendant must invoke his right "unambiguously." *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). The defendant must express his wish to remain silent unambiguously and unequivocally. Mere sustained silence during interrogation may not be enough to effectively invoke that right. *Id.* at 381-382. In *Berghuis*, the Supreme Court held that despite the defendant's refusal to speak for two hours and forty-five minutes during interrogation, the defendant did not invoke his right to silence as he never expressly said that he wanted to remain silent or that he did not want to talk with the police. *Id.* at 379, 382. The Supreme Court further held that by eventually making an uncoerced statement to police after being informed by police of the right to remain silent, the defendant demonstrated an "implied waiver" of the right because "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 384-385.

Many circuit courts have held that when a defendant waives his right to silence and voluntarily speaks with police officers, introducing evidence of the defendant's "selective silence," that he refused to answer specific questions, does not violate the prohibition created by *Doyle. See United States v. Burns*, 276 F.3d 439, 441 (8th Cir. 2002) (when "the accused initially waives his or her right to remain silent and agrees to questioning, but 'subsequently refuses to answer further questions, the prosecution may note the refusal because it now constitutes part of an otherwise admissible conversation between the police and the accused.'") (quoting *United States v. Harris*, 956 F.2d 177, 181 (8th Cir.1992), *cert. denied*, 506 U.S. 827, 113 (1992)); *see also Babick v. Berghuis*, 620 F.3d 571, 580 (6th Cir. 2010) (not improper to show that defendant ended interview and

invoked counsel after first waiving *Miranda* rights); *United States v. Lopez-Lopez*, 282 F.3d 1, 12 (1st Cir. 2002) ("When an accused is given his *Miranda* rights, and then waives those rights by voluntarily making statements, he may not rely on *Doyle* to object to the admission of those statements simply because the statements refer to the act of keeping silent."); *United States v. Pando Franco*, 503 F.3d 389, 397 (5th Cir. 2007) ("We conclude that by answering these questions after having knowingly received proper *Miranda* warnings, [defendant] waived his right to have the entire conversation, including the implicit references to his silence contained therein, used against him as substantive evidence of guilt."); *but see Hurd v. Terhune*, 619 F.3d 1080, 1087 (9th Cir.2010) ("*Miranda* does not apply only to specific subjects or crimes. It applies to every question investigators pose."); *United States v. Ghiz*, 491 F.2d 599, 600 (4th Cir. 1974) (when a defendant expressly invokes his 5th Amendment rights regarding specific questions, it is improper to introduce that silence at trial).

A review of the record before this Court reflects that Petitioner testified at trial and at the habeas proceeding that he communicated with police officers to express that he did not commit the crime and that he wanted to take a lie detector test. (ECF No. 8-4 at 72, No. 8-21 at 19). Petitioner further confirmed in his trial testimony that he told law enforcement officers that he had come home at 2:00 in the morning on April 27, 2010 and was at home in bed at the time the crime was committed; he also told the officers to speak with Ms. Slater in order to corroborate his story. (ECF No. 8-4 at 77). Petitioner testified that he did not provide the officers with details about his trip to Columbus, because they did not ask him what he had done the weekend before the crime was committed. (*Id.* at 74-76).

Given the restricted nature of review under § 2254, the undersigned cannot

conclude that the state courts' determination that counsel's performance was not objectively deficient was unreasonable. The state courts concluded that Petitioner did not invoke his right to silence as his testimony established that he voluntarily made several statements to police officers; moreover, there was no evidence before the jury that Petitioner invoked his right to remain silent. (ECF No. 8-22 at 38-39). Put simply, the prosecutor did not use Petitioner's post-arrest silence against him, because he was not silent. This is not an objectively unreasonable application of Supreme Court precedent. The Supreme Court has held that an individual's assertion of the right to silence must be made unequivocally and unambiguously. *See Berghuis* 560 U.S. at 381. While the state courts did not directly cite the *Berghuis* decision, they appeared to employ its standard in determining whether or not Petitioner invoked his right to silence. (ECF No. 8-22 at 38-40).

The state courts' conclusion that Petitioner's refusal to speak to police officers beyond requesting a lie detector test and denying culpability was not a clear assertion of his right to silence is not an objectively unreasonable application of the standard announced in *Berghuis*. Petitioner did not indicate, either at trial or at the evidentiary hearing, that he ever affirmatively told police officers he wished to exercise his right to silence. At trial, Petitioner testified that he discussed where he was during the kidnapping and robbery and informed police officers that Ms. Slater could confirm his account. (ECF No. 8-4 at 77). The state courts' determination that this pattern of behavior did not evince an unambiguous assertion of the right to silence is not one that is "beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.

After determining that Petitioner had not invoked his right to silence, the state courts concluded that questioning Petitioner regarding what he "did, or did not

voluntarily state to the police," was not improper. (ECF No. 8-22 at 40). While the state courts did not qualify its analysis as such, this is essentially an application of the theory of selective silence. The issue of selective silence has never been directly addressed by the Supreme Court. As discussed above, circuit courts remain divided over the issue. Therefore, it was not an objectively unreasonable application of clearly established federal law for the state courts to determine that it was permissible to question Petitioner regarding his failure to answer some questions after voluntarily speaking with police officers.

As the state courts were not objectively unreasonable in determing that Petitioner did not invoke his right to silence and in finding that the prosecutor's cross-examination regarding Petitioner's interview with police officers was not impermissible, their determination that Petitioner's counsel was not constitutionally ineffective for declining to object to the State's questioning of Petitioner is also not objectively unreasonable. (ECF No. 8-22 at 40). Therefore, the undersigned **FINDS** that the state courts' ruling that Petitioner's counsel's performance was not objectively deficient under the first prong of *Strickland* was not an unreasonable application of clearly established federal law.

The state courts found that, as an objection was unlikely to be sustained, the decision to not object was unlikely to be prejudicial, and, in any event, the substantial evidence presented against Petitioner meant he was unable to show the outcome would have been different as required by the second prong of *Strickland*. (*Id.*). The undersigned **FINDS** that the state courts' denial of Petitioner's claim under the second *Strickland* prong was also not objectively unreasonable. Petitioner's claim is thus unable to succeed as a matter of law.

### 6. Cumulative Errors

Finally, Petitioner claims that the cumulative errors of his defense counsel, while potentially harmless individually, when taken together, effectively denied Petitioner the right to a fair trial. (ECF No. 2 at 10). Respondent urges this Court to deny Petitioner's claim as the state courts correctly determined that the doctrine of cumulative error did not apply to Petitioner's claims. (ECF No. 10 at 28).

"Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) (internal quotations and citations omitted). To reverse for cumulative error, the errors must "so fatally infect the trial that they violated the trial's fundamental fairness." *Basham*, 561 F.3d at 330 (quoting *United States v. Bell*, 367 F.3d 452, 471 (5th Cir.2004)). However, "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's actions deemed deficient." *Fisher v. Angelone*, 163 F.3d 835, 852 n.9 (4th Cir. 1998). For cumulative error to apply then, a court must first conclude that constitutional errors did in fact occur, and while harmless individually, the aggregate effect of the errors was to effectuate grave constitutional harm. *Id.*

As the undersigned has concluded that the state courts' denial of Petitioner's individual ineffective assistance of counsel claims was not inappropriate under the standard of § 2254, there are no constitutional errors on which Petitioner could base a claim of cumulative error. Therefore, the undersigned **FINDS** that Petitioner's claim of cumulative error cannot succeed as a matter of law.

### B. Violation of Sixth Amendment Right to Jury Trial

Petitioner contends that his right to a trial by jury as guaranteed by the Sixth Amendment was violated by the application of West Virginia's kidnapping statute to his case. (ECF No. 2 at 11). Petitioner disagrees with Respondent's contention that the decision in *State v. Haught,* 218 W. Va. at 624, precludes relief on this ground as he asserts that recent Supreme Court precedent dictates a different result. (ECF No. 18 at 16).

Petitioner's claim stems from the decision of the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its progeny. In *Apprendi*, the defendant was convicted of two firearms offenses carrying maximum sentences of ten years each. 530 U.S. at 469–70. At sentencing, the trial judge increased the sentence for one firearm count to twelve years based upon a finding that the defendant's "'purpose' for unlawfully possessing the weapon was 'to intimidate' his victim on the basis of a particular characteristic the victim possessed." *Id.* at 491. The Supreme Court reversed the enhanced sentence, declaring that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.

Later, in *Blakely v. Washington,* 542 U.S. 296, 303, (2004), the Supreme Court clarified that, "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." In 2002, the Supreme Court considered whether the reasoning outlined in *Apprendi* should also apply to judicial fact finding which increased the mandatory minimum sentence, rather than the available maximum sentence. *See Harris v. United States*, 536 U.S. 545, 550 (2002). The Supreme Court concluded that it should

not, holding, "[w]ithin the range authorized by the jury's verdict, however, the political system may channel judicial discretion-and rely upon judicial expertise-by requiring defendants to serve minimum terms after judges make certain factual findings." *Id.* at 567.

On June 17, 2013, the Supreme Court overturned its earlier decision in *Harris. See Alleyne v. United States*, 570 U.S. 99, 103 (2013). In *Alleyne,* the Supreme Court determined that the distinction drawn in *Harris*, "between facts that increase the statutory maximum and facts that increase only the mandatory minimum" was "inconsistent" with the holding in *Apprendi* as well as the Sixth Amendment. *Id.* The *Alleyne* Court held that the Sixth Amendment required "any fact that, by law, increases the penalty for a crime" be submitted to the jury. *Id.* As facts that trigger a mandatory minimum sentence, or facts that lengthen a mandatory minimum sentence, increase the penalty to which the defendant is subjected, they are an "element" of the crime and must be submitted to the jury. *Id.* In overturning *Harris*, the Supreme Court clarified that facts that must be found by a jury and not a judge include "not only facts that increase the ceiling, but also those that increase the floor." *Id.* at 108.

Petitioner was convicted under West Virginia Code § 61-2-14a. The statute, at the time of Petitioner's conviction, provided as follows:

> (a) Any person who, by force, threat, duress, fraud or enticement take, confine, conceal, or decoy, inveigle or entice away, or transport into or out of this state or within this state, or otherwise kidnap any other person, or hold hostage any other person for the purpose or with the intent of taking, receiving, demanding or extorting from such person, or from any other person or persons, any ransom, money or other thing, or any concession or advantage of any sort, or for the purpose or with the intent of shielding or protecting himself, herself or others from bodily harm or of evading capture or arrest after he or she or they have committed a *crime shall be guilty of a felony and, upon conviction, shall be punished by confinement by the division of corrections for life, and, notwithstanding the provisions of*

> *article twelve, chapter sixty-two of this code, shall not be eligible for*
> *parole:* Provided, That the following exceptions shall apply: (1) A jury may,
> in their discretion, recommend mercy, and if such recommendation is
> added to their verdict, such person shall be eligible for parole in accordance
> with the provisions of said article twelve; (2) if such person pleads guilty,
> the court may, in its discretion, provide that such person shall be eligible for
> parole in accordance with the provisions of said article twelve, and, if the
> court so provide, such person shall be eligible for parole in accordance with
> the provisions of said article twelve in the same manner and with like effect
> as if such person had been found guilty by the verdict of a jury and the jury
> had recommended mercy; (3) in all cases where the person against whom
> the offense is committed is returned, or is permitted to return, alive, without
> bodily harm having been inflicted upon him, but after ransom, money or
> other thing, or any concession or advantage of any sort has been paid or
> yielded, the punishment shall be confinement by the division of corrections
> for a definite term of years not less than twenty nor more than fifty; (4) in
> all cases where the person against whom the offense is committed is
> returned, or is permitted to return, alive, without bodily harm having been
> inflicted upon him or her, but without ransom, money or other thing, or any
> concession or advantage of any sort having been paid or yielded, the
> punishment shall be confinement by the division of corrections for a
> definite term of years not less than ten nor more than thirty.

W. Va. Code § 61-2-14a (1999) (emphasis added). In 2005, the WVSC considered whether

the kidnapping statute violated the then evolving Supreme Court precedent regarding the

Sixth Amendment right to have elements of a crime determined by a jury and not a judge.

*State v. Haught*, 218 W. Va. 462, 465 (2005). The *Haught* Court specifically held that the

Sixth Amendment principles espoused in *Apprendi* and *Blakely* were not violated by West

Virginia's kidnapping statute because the statute did not provide for an enhancement

beyond the statutory maximum. The *Haught* Court stated:

> After careful consideration of this issue, we reject Appellant's argument.
> This Court believes that *Blakely*, is clearly distinguishable from the instant
> case. *Blakely* stands for the principle that any fact, other than a prior
> conviction, that increases the penalty for a crime beyond the statutory
> maximum must be submitted to a jury and proved beyond a reasonable
> doubt. In *Blakely*, the facts admitted by Blakely qualified him for a standard
> sentence of 53 months. This sentence, however, was impermissibly
> enhanced to 90 months after the trial judge made additional findings of fact.
> In contrast, the statutory maximum in this case, or in other words, the
> maximum sentence that Appellant could receive based on the jury's

64

> findings, was life with mercy which is the sentence Appellant received. Thus, Appellant received no greater sentence than the statutory maximum. In sum, it is clear to this Court that, pursuant to the statute, any additional findings of fact made by the trial judge can only operate under the statute to *reduce* and not *enhance* a defendant's sentence.

*Id.* at 467 (emphasis original). Thus, the *Haught* Court concluded that as a conviction for kidnapping resulted in a default sentence of life, the fact that a judge could *reduce* that sentence by finding certain facts, but could not increase the sentence, did not violate the Supreme Court prohibition on judge-made fact-finding that increases the statutorily available sentence.

In 2011, this Court ruled on a § 2254 petition that argued the application of W. Va. Code § 61-2-14a violated the Sixth Amendment. *Rabb v. Ballard*, No. CIV.A. 2:09-0159, 2011 WL 1299354, at *1 (S.D.W. Va. Mar. 31, 2011). In *Rabb,* the Magistrate Judge recommended that the petitioner's request for relief be granted and urged the District Court to find that the state courts' decisions denying Petitioner relief on this ground were contrary to clearly established Federal law, as determined by the Supreme Court of the United States. *Rabb v. Ballard*, No. 2:09-CV-00159, 2011 WL 1299359, at *27 (S.D.W. Va. Feb. 24, 2011). The District Court, however, declined to grant the petitioner relief, determining that the validity of the state courts' decisions should be determined not by "Supreme Court precedent at the conclusion of state habeas proceedings, but rather the shape of things on the date when direct appellate review terminated." *Rabb*, No. CIV.A. 2:09-0159, 2011 WL 1299354 at *2. The Magistrate Judge had ruled on the petitioner's claim while considering cases that occurred during the petitioner's state habeas petitions such as *Apprendi, Harris,* and *Ring v. Arizona,* 536 U.S. 584 (2002). However, the District Court concluded that the state courts' decisions should only be judged in light of clearly established precedent as of October 12, 1999, the date direct appellate review of

the petitioner's case became final. *Id.* at *3. In that time frame, the most recent relevant

Supreme Court decision was *Jones v. United States*, 526 U.S. 227 (1999). *Id.*

Analyzing the statute based solely on the precedent established in *Jones*, the

District Court held that:

> [T]he West Virginia statute unambiguously provides for a life sentence if it
> is charged and found by the jury beyond a reasonable doubt that one has
> taken another, by force or similar involuntary means, intending to either
> receive money or things in return, or to protect the taker from bodily harm
> or aid in his escape from law enforcement after he committed a crime. That
> is the crime the Legislature sought to punish with a life term. The fact that
> the life term might be diminished by other judicially found facts in the third
> and fourth provisos would not have given rise to constitutional concerns at
> the time of *Jones*. Given the state of Supreme Court precedent at that time,
> one cannot fault the supreme court of appeals for failing to overrule over
> thirty years of accumulated precedent applying section 61–2–14a.

*Id.* at *5 (citations omitted). The District Court concluded that the state courts' decisions

could not be considered an unreasonable application of clearly established federal law

under § 2254(d). *Id.* The District Court further stated that, "[t]o the extent any doubt

lingers respecting that conclusion, it is noteworthy that challenges in comparable settings

have been turned away even following the decisions in *Apprendi* and *Blakely v.*

*Washington,* 542 U.S. 296 (2004)." *Id.* at * 6. The District Court therefore declined to

grant relief to the petitioner on that claim as recommended by the Magistrate Judge. *Id.*

Petitioner argues that the Supreme Court decision in *Alleyne* undermines the

holding in *Haught*. (ECF No. 18 at 16). Petitioner believes that as the statute requires a

judge to make factual determinations that alter the mandatory minimum sentence, the

holding in *Alleyne* dictates a different result, as the statute allows a judge to raise the

legally imposed "floor," in violation of *Alleyne*.

Petitioner was sentenced in April 2011, and the WVSC affirmed his conviction on

April 16, 2013. (ECF Nos. 8-8, 8-14). Petitioner declined to appeal the decision to the

Supreme Court. The Supreme Court decision in *Alleyne*, was issued on June 17, 2013. *See* 570 U.S. 99, 103 (2013). Review of Petitioner's claim is confined by § 2254(d) which requires that a federal court only review whether state courts' decisions were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, on the date when direct appellate review terminated. *See Daniels v. Lee*, 316 F.3d 477, 492 n.12 (4th Cir. 2003) ("we review clearly established law, as determined by the Supreme Court... as of the time of the relevant state court decision. The phrase 'the time of the relevant state court decision,' however, obviously refers to the time of the state court conviction being attacked ... and not the time of the state court decision denying collateral relief from the conviction.") (internal quotations and citations omitted); *see also Rabb,* No. CIV.A. 2:09-0159, 2011 WL 1299354 at *2-3.

If, as here, the § 2254 petitioner does not petition for a Writ of Certiorari in the Supreme Court upon the denial of direct review in the highest state court, then the one-year limitation period begins to run 90 days after judgment is entered in the highest state court (i.e., when the period for filing a petition for a Writ of Certiorari in the Supreme Court expires). *See Harris v. Hutchinson,* 209 F.3d 325, 328 n.1 (4th Cir. 2000). As Petitioner did not appeal the affirmation of his conviction by the WVSC, direct review of his case terminated 90 days after that decision, on July 16, 2013. The decision in *Alleyne,* therefore, must be considered in reviewing the reasonableness of the state courts' decision under § 2254(d) as it was issued during that 90 day period.

The unusual structure of W. Va. Code § 61-2-14a makes it somewhat difficult to apply the language of the Sixth Amendment cases. Rather than starting with a mandatory minimum sentence and describing findings of fact which can be used to increase that

sentence, the statute imposes a maximum sentence on conviction, and then describes mitigating facts which, if found, may reduce the sentence. While the statute specifies that the jury is to determine whether a recommendation of mercy is warranted when reaching a guilty verdict at trial, and the court may, in its discretion, apply a mercy recommendation when a guilty plea is entered, the statute is silent as to whether the presence of the mitigating facts set forth in provisos 3 and 4 should be determined by a judge or the jury. Nonetheless, West Virginia state courts have determined that the mitigating facts may be determined by the judge at sentencing. *See Haught,* 218 W. Va. 462 at 624.

Federal courts are instructed to defer to state courts' interpretation of state law. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983) ("the views of the state's highest court with respect to state law are binding on the federal courts"); *Faircloth v. Finesod*, 938 F.2d 513, 517 n.9 (4th Cir. 1991)("This court is bound by the state court's interpretation [of a state statute], and must assume that the statute says what the state court says it says."). The statute in operation at the time of Petitioner's conviction provided that "[a]ny person" who was found guilty of the act of kidnapping as defined in subsection (a), "shall be punished by confinement by the division of corrections for life." W. Va. Code § 61-2-14a(a) (1999). However, the statute further stated that, "the following exceptions shall apply," and listed four circumstances which would result in deviation from the, otherwise imposed, life sentence. *Id.* at (a)(1-4).

The WVSC has determined that by the terms of the statute, the default sentence upon conviction is life imprisonment; a jury may reduce this sentence by granting the defendant mercy without making any factual findings. Similarly, a judge's factual findings may alter the penalty associated with the crime, but those findings may only operate to

*reduce* the default sentence. *See Haught*, 218 W. Va. 462 at 467 ("In sum, it is clear to this Court that, pursuant to the statute, any additional findings of fact made by the trial judge can only operate under the statute to *reduce* and not *enhance* a defendant's sentence.") (emphasis original). Accordingly, the statute does not run afoul of the Sixth Amendment. While this is not the only possible interpretation of the somewhat peculiar statutory structure contained in § 61-2-14a, it is not an objectively unreasonable one. As the statute does baldly state that "any person" who is found to have committed the crime as defined in subsection (a) is to be sentenced to life without parole, determining that the qualification of the circumstances outlined in provisos 1-4 as "exceptions" means the default sentence for convictions is life without parole is not clearly contrary to the statutory language.

Moreover, the state court's interpretation of the statute—that it imposes a default life sentence with a mitigation scheme that does not violate the Sixth Amendment—makes logical sense when considering the rationale expressed in *Alleyne*. In *Alleyne*, the Supreme Court emphasized that the "touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an 'element' or 'ingredient' of the charged offense." *Alleyne,* 507 U.S. at 107 (quoting *United States v. O'Brien*, 560 U.S. 218 (2010)). Consequently, where a statute includes a higher degree of punishment if the offense is committed under particular aggravating circumstances, then those circumstances are elements of the crime and should be stated in the charging document with certainty and precision. *Id.* at 111-12. "This reality demonstrates that the core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury." *Id.* at 113. In *Alleyne*, the defendant was charged with using or carrying a firearm in relation to a

69

crime of violence. If he brandished the firearm while using and carrying it, the mandatory minimum sentence was increased by two years. The Supreme Court concluded that because the fact of brandishing enhanced the sentence associated with the core crime of carrying and using the firearm, it constituted an "element" of a new, aggravated crime that must be found by a jury. *Id.* at 115.

In contrast to the scenario described in *Alleyne*, the four exceptions contained in W. Va. § 61-2-14a do not constitute aggravating circumstances related to the act of kidnapping and do not increase the punishment associated with the core crime; instead, all four exceptions pertain, in part, to circumstances that occur *after* the crime has already been committed and that serve to potentially decrease the punishment. The first two exceptions allow discretionary reductions in sentence *without any* requisite factual findings. The other two exceptions describe mitigating behaviors by the perpetrator of the crime that occur after the kidnapping has already been committed. For instance, while provisos 3 and 4 implicitly require that the victim be unharmed during the kidnapping, they also require the victim to remain unharmed after the kidnapping has been completed, and the victim to be returned or be allowed to return. While a perpetrator's harsh treatment of a victim post-kidnapping may give rise to additional charges against the perpetrator, that treatment would not constitute "elements" or aggravating circumstances of the kidnapping itself. *See Rabb,* 2011 WL 1299359, at \*4-5. Similarly, while a perpetrator's benevolent treatment would not alter the fact that a kidnapping occurred, that treatment might reduce the severity of the ultimate punishment. Accordingly, none of the four exceptions contain elements specific to the core crime, nor elements of a "new, aggravated crime," that would be included in a document charging kidnapping. Viewed from that perspective, *Alleyne* arguably has no relevance to West

Virginia's kidnapping statute.

In addition, federal courts have considered the application of the rule announced in *Alleyne* to the somewhat analogous statute contained in 18 U.S.C.A. § 3553(f), commonly known as the "safety valve" statute. *See e.g. United States v. King,* 773 F.3d 48, 50 (5th Cir. 2014). The safety valve statute provides that, for specified statutory offenses, if the Court makes certain factual findings it may depart from the statutory minimum otherwise applicable. *See* 18 U.S.C.A. § 3553(f). In order for the lower minimum sentence contained in the safety valve to apply, a judge must make the following factual determinations regarding the defendant:

> (1) he does not have more than one criminal history point; (2) he did not use or threaten violence or possess a firearm or other dangerous weapon; (3) the offense did not result in death or serious bodily injury; (4) he was not an organizer, leader, manager, or supervisor of others; and (5) he truthfully provided the government with all evidence and information about the offense and related offenses.

*United States v. Aidoo*, 670 F.3d 600, 605 (4th Cir.2012) (citing 18 U.S.C. § 3553(f)). While this issue has not yet been addressed by the Supreme Court, circuit courts have unanimously upheld the statute against challengers alleging that the judicial fact-finding it allows violates the rule announced in *Alleyne. See United States v. Caballero,* 672 F. App'x 72, 75 (2d Cir. 2016) ("[T]he only effect of the judicial fact-finding is either to reduce a defendant's sentencing range or to leave the sentencing range alone, not to increase it. Because *Alleyne* is concerned with judicial fact-finding that "aggravates" the legally prescribed punishment, the statutory lenity embodied by the safety valve is not implicated.") (internal citations and quotations omitted); *see also King,* 773 F.3d 48, 55, ("Indeed, throughout the opinion, *Alleyne* emphasizes the aggravating nature of increasing a mandatory minimum sentence. In contrast, the safety valve at issue here

*mitigates* the penalty.") (emphasis original); *United States v. Silva*, 566 F. App'x 804, 807 (11th Cir. 2014) ("All that changed as a result of the court's finding was that [petitioner] was not eligible for a sentence below that mandatory minimum. As a result, the district court's safety-valve findings did not increase his mandatory minimum sentence as prohibited by *Alleyne*.") (unpublished per curiam); *United States v. Leanos,* 827 F.3d 1167, 1169 (8th Cir. 2016) ("[petitioner] argues that the district court erred because safety-valve ineligibility in effect increases his mandatory minimum sentence. We disagree."); *United States v. Harakaly*, 734 F.3d 88, 98 (1st Cir. 2013) ("We do not read *Alleyne* so expansively. A fact that precludes safety-valve relief does not trigger or increase the mandatory minimum, but instead prohibits imposition of a sentence below a mandatory minimum already imposed as a result of the guilty plea or jury verdict."); *United States v. Lizarraga-Carrizales*, 757 F.3d 995, 999 (9th Cir. 2014) (safety valve statute does not violate *Alleyne*); *United States v. Juarez-Sanchez*, 558 F. App'x 840, 843 (10th Cir. 2014) (same) (unpublished). While it does not appear that the Fourth Circuit has addressed this issue, at least one District Court in this circuit has decided that the judicial fact-finding required by the safety valve statute does not implicate the prohibition announced by *Alleyne* for the reasons outlined above*. See United States v. Aboulhorma*, 57 F. Supp. 3d 636, 639 (E.D. Va. 2014).

   The judicial fact-finding allowed by the statutory scheme in the safety valve statute and in the West Virginia kidnapping statute are similar. Under the safety valve statute, when considering certain statutory offenses, the judge may make factual findings that allow the court to impose a sentence lower than the, otherwise applicable, statutory minimum. Under the West Virginia kidnapping statute as interpreted by the state courts, after a person has been convicted of kidnapping under subsection (a), the judge may

depart from the, otherwise mandatory, sentence of life if she makes specified factual findings. While the statutes are not identical in their structure, the logic employed by courts in upholding the safety valve statute is persuasive here.

As noted by the circuit courts when weighing the application of *Alleyne* to the safety valve statute, the crux of that case's holding was that the Sixth Amendment does not permit a judge to find facts which "aggravate" the sentencing range beyond that originally provided by the jury. *Alleyne,* 570 U.S. at 114–15. In this case, when a person is convicted of kidnapping as defined by § 61-2-14a(a), they are sentenced to life in prison. This at least is the interpretation of the statute as determined by West Virginia state courts. The sentence of life, with or without parole, thus operates as both the default statutory minimum and maximum sentence upon conviction. The statute further provides that judges are able to make specified factual findings which *reduce* this mandatory sentence into discrete categories of terms of years. Judges then are not able to *increase* the mandatory minimum sentence beyond what is provided by a jury verdict as a jury verdict will always provide a mandatory minimum sentence of life, with or without parole, which judicial fact-finding may only decrease not increase.

Petitioner does not argue that the West Virginia legislature is constitutionally prohibited from assigning a life sentence to all those convicted of violating its kidnapping statute. If the kidnapping statute consisted only of subsection (a), it would not violate the Sixth Amendment. The fact that the statute also grants judges the authority to depart from this mandatory sentence does not implicate the prohibition announced in *Alleyne* as the statute does not allow judicial fact-finding to increase the mandatory minimum or maximum penalty. It is true that under the statute, judicial fact-finding can result in different mandatory minimum or maximum sentences, however, these sentences are all

*lower* than that imposed by a conviction. *See Dominguez v. Spearman*, No. EDCV1601172DMGAJW, 2017 WL 6508981, at \*12 (C.D. Cal. July 19, 2017), *report and recommendation adopted,* No. EDCV161172DMGAJW, 2017 WL 6512214 (C.D. Cal. Dec. 18, 2017), *certificate of appealability denied,* No. 18-55089, 2018 WL 3570663 (9th Cir. July 12, 2018), *cert. denied sub nom. Sandoval Dominguez v. Spearman*, 139 S. Ct. 606 (2018) (holding that there is "no clearly established federal law" requiring a jury to find beyond a reasonable doubt facts that would decrease a sentence below a mandatory minimum).

In sum, *Alleyne* is not implicated when the statute is interpreted in this way. Applying the highly deferential standard of review contained in § 2254, which instructs federal courts to overturn a state court decision only when there is no "possibility for fairminded disagreement," the undersigned cannot conclude that the state courts erred when they determined that the West Virginia kidnapping statute does not violate the Sixth Amendment. *Harrington,* 562 U.S. at 103. Therefore, the undersigned **FINDS** that Petitioner is not entitled to relief on this claim and that Respondent is entitled to judgment as matter of law.

## IV.   <u>Proposal and Recommendations</u>

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** the following:

1.   Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 2), be **DENIED**;

2.   Respondent's Motion for Summary Judgment, (ECF No. 8), be **GRANTED**;

3.   This action be **DISMISSED, with prejudice.**

The parties are notified that this "Proposed Findings and Recommendations" is

hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, The parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner and counsel of record.

**FILED:**  February 8, 2019

Cheryl A. Eifert
United States Magistrate Judge